**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| |
|---|
| BRIAN REAVES, on behalf of himself and all others similarly situated, |
| Plaintiffs, |
| v. |
| MFS SERIES TRUST I, et al., |
| Defendants. |

Civil Action No. 05-CV-10804 (MEL)

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

All Defendants respectfully submit this Memorandum of Law in opposition to Plaintiff's Motion to Remand this action to the Suffolk County Superior Court of the Commonwealth of Massachusetts. As discussed below, Plaintiff's claim is completely preempted by the Securities Litigation Uniform Standards Act 1998 ("SLUSA"), 15 U.S.C. §§ 77p(b), 78bb(f)(1). The Complaint also presents substantial federal questions, over which this Court has jurisdiction. Accordingly, Plaintiff's Motion to Remand should be denied.

**<u>Introduction</u>**

This case is one of more than 20 cases filed against MFS management investment companies, their investment advisers, and other service providers since the fall of 2003 alleging misconduct relating to the "market timing" of MFS mutual funds. As with the others, the case is a direct result of investigations by the U.S. Securities and Exchange Commission and state regulators relating to market timing in the mutual fund industry, which culminated in consent orders relating to MFS funds and numerous other mutual fund "complexes." *See* Compl. ¶¶ 3, 22-26 (citing orders).

Beginning in February 2004, the Judicial Panel on Multidistrict Litigation ("JPML" or "Panel") has transferred the vast majority of these cases – including a number that were removed from state court – to the United States District Court for the District of Maryland ("MDL Court") for coordinated pretrial case management, as part of a comprehensive multidistrict litigation involving not only the cases concerning MFS mutual funds, but more than 300 other cases asserting similar claims with respect to other mutual fund "complexes" ("Mutual Fund MDL").

In this Court, Plaintiff asks that his case be remanded to state court, so that he may litigate separate from the Mutual Fund MDL. While the crux of his claim is the same alleged market timing of mutual funds that is at the core of all the cases pending before the MDL Court, Plaintiff says that since his claim is made on behalf of certain *holders* of mutual fund shares, he can avoid preemption under SLUSA and proceed in state court instead. Plaintiff further argues that his claim involves no federal question sufficient to confer jurisdiction on this Court, and that the outcome in this case is controlled by Judge Young's ruling in a prior case, *Meyer v. Putnam International Voyager Fund,* 220 F.R.D. 127 (D. Mass. 2004).

Plaintiff is wrong. As recent decisions by the Second, Third and Seventh circuit courts of appeals make clear, a plaintiff cannot avoid SLUSA preemption simply by claiming to be a "holder." SLUSA preempts claims alleging misconduct "in connection with" the purchase or sale of securities, and if the facts pleaded show that this condition is met, the case is preempted. *See Kircher v. Putnam Funds Trust,* 403 F.3d 478, 482-84 (7th Cir. 2005); *Rowinski v. Salomon Smith Barney Inc.,* 398 F.3d 294, 300-05 (3d Cir. 2005); *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 44-51 (2d Cir. 2005). Plaintiff's claim also necessarily raises substantial federal questions, and Judge Young's opinion in *Meyer* is not controlling. Accordingly, Plaintiff's Motion to Remand should be denied.

**<u>Motion To Stay</u>**

On April 26, 2005 Defendants filed a Notice of Tag-Along Action with the JPML, seeking transfer of this case to the MDL Court (dkt. 2). On May 6, the JPML issued a Conditional Transfer Order ("CTO"), finding that the case "appears . . . [to] involve[ ] questions of fact which are common to the actions previously transferred to the District of Maryland." *See* CTO-17, Ex. 1 to Memorandum in Support of Defendants' Motion to Stay (dkt. 9).

On June 7, before the JPML, Plaintiff filed a Motion to Vacate the CTO, arguing that the case should not be transferred to the MDL Court. On June 10, in this Court, Defendants filed a Motion to Stay further proceedings until the JPML decided whether to transfer the case (dkt. 8). On June 14, the JPML scheduled Plaintiff's motion for hearing on July 28, 2005. *See* Hearing Session Order (June 14, 2005) (Ex. 1 hereto).

Defendants respectfully suggest that, for the reasons set forth in their Motion to Stay, this Court should defer consideration of Plaintiff's Motion to Remand until the JPML has determined whether the case should be transferred to the MDL Court. If transfer is ordered, the motion may be considered with other cases identical to this one that have been removed to federal court and tagged for transfer to the MDL Court, and with other cases previously transferred to the MDL Court presenting similar legal issues. Indeed, in a preliminary ruling on the issue of SLUSA preemption, the MDL Court expressly noted that:

> The alleged wrongdoing giving rise to plaintiffs' claims occurred in the national securities market – a market extensively regulated by federal authorities. . . . The need for a single rule of decision in a complex financial environment in which innumerable institutions and firms participate . . . appears self-evident.

*In re Alger, Columbia, Janus, MFS, One Group and Putnam Mutual Fund Litig.,* 320 F. Supp. 2d 352, 355-56 (D. Md. 2004). These considerations urge deferral of Plaintiff's Motion to Remand at this time.

## The Complaint

In his Complaint, Plaintiff Brian Reaves claims that he owns "Class B" shares of a mutual fund, the MFS Value Fund, that require him to pay a contingent deferred sales charge ("CDSC") in the event he redeems the shares prior to the expiration of six years from the date he purchased them. Compl. ¶¶ 1, 7.[1] Plaintiff admits he agreed to pay these charges when he purchased his shares, but says he now desires to avoid this obligation because "MFS through certain of its employees (and agents) engaged in misconduct . . . including market timing . . . [and] unfair business practices" regarding MFS mutual funds. *Id.* ¶¶ 2, 20. Purportedly on behalf of a class of mutual fund investors, Plaintiff sues eight different MFS management investment companies, in addition to the one that issued his shares.

## ARGUMENT

Plaintiff's Motion to Remand should be denied because his claim is completely preempted by SLUSA. In addition, the Complaint presents substantial questions of federal law over which this Court has jurisdiction.

## I.    Plaintiff's Claim Is Preempted by SLUSA.

SLUSA was adopted to "make[ ] Federal Court the exclusive venue for most securities class action lawsuits . . . [and to] prevent plaintiffs from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State, rather than in Federal, court." H.R. Conf. Rep. No. 105-803 (1998), at 13. *See Behlen v. Merrill Lynch,* 311 F.3d 1087, 1091-92 (11th Cir. 2002). To achieve this goal, SLUSA expressly preempts any "covered class action based upon the statutory or common law of any State," which alleges either an "untrue

---

[1]    Mutual funds distributed through brokers, life insurance companies, and other intermediaries typically carry fees, called "sales loads," which are charged to shareholders either at the time of purchase, upon redemption, or both. Where shares of the same fund are offered with different load options, the shares are typically divided into different classes, with Class B shares usually involving no front-end load, but a CDSC that declines over time. *See generally ING Principal Protection Funds Deriv. Litig.,* 2005 WL 1107072, at *1 (D. Mass. May 9, 2005).

statement or omission of a material fact" or the use of "any manipulative or deceptive device," "in connection with the purchase or sale of a covered security." 15 U.S.C. §§ 77p(b), 78bb(f)(1).

As set forth in Defendants' Notice of Removal, the Complaint in this case meets all of these requirements. Indeed, in his Motion to Remand, Plaintiff challenges only one of these requirements – that the misconduct he alleges is "in connection with" the purchase or sale of securities. (Pl. Mem. at 5-7). Plaintiff's argument is incorrect, and his claim is preempted.[2]

## A.    Because SLUSA Is a Remedial Statute, Its "In Connection With" Requirement Must Be Construed Broadly.

SLUSA is a remedial statute designed to prevent securities class action plaintiffs from circumventing the procedural protections Congress adopted in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737 (1995). The PSLRA, codified in relevant part at 15 U.S.C. § 78u-4, prescribes heightened pleading standards for private securities fraud suits, 15 U.S.C. § 78u-4(b)(1) & (2), and requires the dismissal of any complaint that fails to meet these heightened pleading requirements. 15 U.S.C. § 78u-4(b)(3)(A). The PSLRA also provides for a mandatory stay of discovery during the pendency of a motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B). Shortly after it was adopted, "Congress realized that many of the goals of [the] PSLRA were being frustrated because plaintiffs were simply shifting their securities class actions from federal to state court, where the PSLRA did not restrict their claims." *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 292 F.3d 1334, 1341 (11th Cir.) (citing Pub. L. No

---

[2]        In the "Facts" section of Plaintiff's Motion to Remand, Plaintiff asserts that "there is no allegation that defendants made any misrepresentations about their funds" and that the "Complaint does not allege fraud in connection with the purchase or sale of securities." Pl. Mem., at 3. To the extent this constitutes an argument that the Complaint does not allege any material misstatement or omission, or any manipulative or deceptive device, *see* 15 U.S.C. § 77p(b)(1), (2), it ignores the plain language of the Complaint. *See, e.g.*, Compl., ¶¶ 18, 19 ("MFS . . . represented and warranted that it would continue to conduct its business at the same level of integrity"), ¶ 20 (Defendants engaged in "misconduct," including "unfair business practices," and their integrity was "seriously compromised"); ¶ 26 (Defendants allegedly "unethical or dishonest"), ¶ 30(c) (defendants allegedly "engag[ed] in unfair and deceptive trade practices"). *See also Rowinski,* 398 F.3d at 299-300 (claims alleging misrepresentations or omissions are preempted, regardless of whether they are legal elements of the claims).

105-353 § 2(2)), *cert. denied*, 537 U.S. 950 (2002).  SLUSA was adopted in 1998 to close this

loophole.  *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001).

The federal courts of appeals have instructed that "[i]n construing the meaning of

SLUSA's key terms, [a court] must view SLUSA in this larger statutory context."  *Riley,* 292

F.3d at 1340.  Hence, when a court considers whether SLUSA's "in connection with

requirement" has been met, the statute should be "construed not technically and restrictively, but

flexibly to effectuate its remedial purposes."  *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129

(9th Cir. 2002) (quoting *SEC v. Zandford*, 525 U.S. 813, 819 (2002)).[3]

Although SLUSA does not define the phrase "in connection with," the identical phrase is

found in Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b).  Courts construing

SLUSA's "in connection with" requirement, therefore, have looked to cases interpreting the

identical language in Section 10(b).  *See Falkowski*, 309 F.3d at 1129; *Riley*, 292 F.3d at 1342.

According to the Supreme Court, the "in connection with" requirement of Section 10(b)

should be construed broadly.  For example, in *SEC v. Capital Gains Research Bureau*, 375 U.S.

180, 186 (1963), the Supreme Court ruled that the "in connection with" requirement must be

construed "not technically and restrictively, but flexibly" in order to promote the remedial

purpose of Section 10(b).  *Id.* at 195.  *See also Affiliated Ute Citizens v. United States*, 406 U.S.

128, 151 (1972) (same).  Applying this principle in *Superintendent of Ins. v. Bankers Life & Cas.*

*Co.*, 404 U.S. 6 (1971), the Supreme Court found that the "in connection with" requirement was

met when deceptive practices "touch" the purchase or sale of securities.  *Id.* at 12-13.

The Supreme Court reiterated this principle in *SEC v. Zandford*, 535 U.S. 813 (2002).  In

that case, a securities broker persuaded two clients to open a joint account, then liquidated their

---

[3]      Plaintiff argues that "removal statutes" should be strictly construed.  Pl. Mem., at 3-4.  However, SLUSA
is not a "removal statute," it is a remedial statute, and therefore "should be construed broadly to effectuate its
purposes."  *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (applying "familiar canon of statutory construction").

securities and misappropriated the funds for his own use. *Id*. at 815-16. The Supreme Court rejected the argument that the facts showed only common law fraud, conversion and breach of fiduciary duty, noting that the complaint described "a fraudulent scheme in which the securities transactions and breaches of fiduciary duty coincide." *Id*. at 825. *See also United States v. O'Hagan,* 521 U.S. 642, 656 (1997) (misconduct and securities transaction coincide where attorney used information about client's planned tender offer to trade stock of target company).

Accordingly, SLUSA's "in connection with" requirement should be considered satisfied if the alleged misconduct "coincides" with or "touches" a purchase or sale of securities. *Zandford*, 535 U.S. at 822; *Bankers Life*, 404 U.S. at 12-13. This standard is established when misconduct has more than a "tangential" relation to a securities transaction, *Falkowski,* 309 F.3d at 1130-31, or "necessarily involve[s] allegations of a purchase or sale of securities," *Dabit*, 395 F.3d at 48, or if "the prayer for relief 'connects' the state law claims to the purchase or sale of securities." *Rowinski*, 398 F.3d at 302.

### B.    The "In Connection With" Requirement Is Met Here.

The allegations in the Complaint readily meet these standards. The alleged misconduct coincides with the purchase and sale of MFS fund shares because (1) the essence of the Complaint is that Defendants breached a term or condition of the agreement under which Plaintiff purchased his shares, which will damage Plaintiff once he redeems those shares, and (2) Plaintiff's class definition expressly includes other investors who already have redeemed their shares and suffered this alleged injury, and does not exclude claims by investors who purchased shares during the class period. In addition, even if the Complaint had expressly excluded claims by purchasers and sellers of MFS Funds, the case still would be preempted because SLUSA is not limited to claims brought by purchasers and sellers of securities.

### 1. Plaintiff Alleges That Defendants Breached A Condition Of Their Contract, And That He Is Injured When Shares Are Redeemed.

As alleged in the Complaint, when Plaintiff purchased his shares, he did so pursuant to a contract that required him to pay a CDSC if he redeemed those shares before the expiration of six years from the date of purchase. Compl. ¶ 1. Plaintiff further alleges that "an implied term of the agreement pursuant to which the investments were made," *id.* ¶ 2, was that Defendants would make "the interests of fund shareholders their highest priority." *Id.* ¶ 18. Plaintiff claims Defendants breached the parties' agreement by "engaging in various forms of misconduct, including market timing, which indicated . . . that the interests of the fund shareholders was not the highest priority, that they did not act in good faith . . . and that their integrity was seriously compromised." *Id.* ¶ 20. Because of this alleged breach, Plaintiff argues, he and the members of the putative class should be allowed to redeem their shares without paying the CDSC. *Id.*

First, these claims "necessarily involve allegations of a purchase or sale of securities." *Dabit*, 395 F.3d at 48. According to the Complaint, the alleged misconduct violated a contract term "pursuant to which" Plaintiff *purchased* his shares. Compl. ¶ 2.[4] In addition, as alleged in the Complaint, the CDSC only takes effect upon a *redemption* of those shares within a six-year period following their purchase. *Id.* ¶ 1. In fact, some putative class members have *already redeemed* their shares, and "been . . . required to pay a significant [CDSC] charge," *id.* ¶ 25, which the Complaint seeks to recover. *Id.* at 9. Plaintiff's claim therefore touches, coincides with, and is directly connected to his purchase and redemption of shares in MFS funds. *See Rowinski*, 398 F.3d at 303 ("prayer for relief encompasses trading fees and commissions – charges incurred only in connection with the purchase and sale of securities"); *Behlen*, 311 F.3d

---

[4]    This alleged breach was allegedly "so material as to justify Plaintiff and all class members to terminate the contracts." *Id.* ¶ 31. By definition, a material breach occurs when "an essential and inducing feature of the contract" is violated. *See, e.g., Lease-It, Inc. v. Mass. Port Auth.,* 33 Mass. App. Ct. 391, 396 (1992).

at 1094 (fees and commissions about which plaintiffs complain "were not incidental to the sale of securities, but were an integral part of the transactions"); *Falkowski,* 309 F.3d at 1130-31 (concealment of facts about company's operations "coincides" with plaintiffs' acquisition of stock options and therefore meets SLUSA's "in connection with" requirement).

Second, as the Complaint makes clear, Plaintiff bases his claim of breach on certain consent orders entered by the SEC and state regulators. Compl. ¶¶ 22-26. In particular, Plaintiff expressly relies on the "specificity of the wrongdoing alleged" by these government authorities, *id.* ¶ 3, including "a litany of findings constituting misconduct." *Id.* ¶ 23. Notwithstanding this misconduct, claims Plaintiff, "Class Members that wish to sell their shares . . . have been and will be required to pay a significant charge." *Id.* ¶ 25.

The SEC Order that Plaintiff references states, among other things, that "MFS had an internal policy not disclosed in its prospectuses that permitted market timing in a group of MFS Retail Funds internally designated as 'Unrestricted Funds' from at least late 1999 through October 2003." SEC Order Instituting Administrative and Cease-And-Desist Proceedings, at ¶ 9 (Feb. 5, 2004) (Ex. 2 hereto).[5] The putative class, however, includes "all holders of Class B shares of MFS mutual funds as of December 8, 2003" which are or have been subject to a CDSC. Compl. ¶ 9. As a result, the class necessarily includes some number of investors who purchased their shares after 1999, when, according to the consent order, the prospectuses were "misleading." SEC Order Feb. 5, 2004, at ¶¶ 9, 15.

Consequently, the Complaint implicitly alleges misrepresentations by Defendants at the time these individuals purchased their shares. As to them, Plaintiff's theory is that, at the same

---

[5]     The Court may consider this public document in resolving Plaintiff's motion, as Plaintiff himself relies on it in his Complaint. *See, e.g., Jorge v. Rumsfeld,* 404 F.3d 556, 559 (1st Cir. 2005) (motion to dismiss); *Warner v. Atkinson Freight Lines Corp.,* 350 F. Supp. 2d 108, 112 (D. Me. 2004) (considering document "integral to Plaintiff's Complaint" for purposes of deciding motion to remand).

time Defendants were "contract[ing]" with members of the putative class to make investors' interests Defendants' "highest priority," Compl. ¶¶ 18-19, Defendants knew they were not doing so. *Id.* ¶ 20. Such a claim is plainly "in connection with" the purchase of securities.

The claims in *Dabit* are analogous. There, the plaintiffs sued to recover certain fees and commissions they paid to defendants for investment advice. 395 F.3d at 30. The plaintiffs claimed breach of contract: that, despite their agreement to provide plaintiffs with objective advice, the defendants provided them with biased advice in order to curry favor with investment bankers. *Id.* The defendants removed the case and argued that the claims were preempted by SLUSA. *See id.* at 31. The court agreed, finding that while the complaint was "generally careful to discuss only retention of [securities] during the relevant 'class period,'" it also alleged that misrepresentations were made during the same time. *Id.* at 45-46. "Thus the complaint sweeps in the claim of [putative class members] who purchased the stock during the class period in reliance on the misrepresentations and were damaged thereby." *Id.* at 46.

Other courts have reached similar conclusions. *See Professional Mgmt. Assoc., Inc. Employees' Profit Sharing Plan v. KPMG LLP*, 335 F.3d 800, 803 (8th Cir. 2003) (where plaintiff alleges misrepresentations before he "bought and held" stock, he implicitly alleges misconduct "in connection with" purchase of securities), *cert. denied*, 540 U.S. 1162 (2004); *Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 878 (8th Cir. 2002) (essence of claim is that defendants' misconduct caused plaintiffs to invest in inappropriate securities); *see also Rowinski*, 398 F.3d at 300-02 (question is not whether "misrepresentation" is an element of plaintiff's claim, but "whether the SLUSA elements are 'alleged' in one form or another").

Third, the Complaint specifically alleges that substantial redemptions by shareholders following disclosure of market timing in MFS funds constitute a breach of contract. Compl. ¶

3(c) (the "facts and circumstances . . . constitut[ing] a breach of the agreement . . . between defendants and class members" includes "the substantial redemptions by shareholders following the charges being made public"). As redemptions clearly constitute "sales" of securities within the meaning of SLUSA, Plaintiff has alleged misconduct "in connection with" the purchase or sale of securities and his claim is preempted.

### 2. Plaintiff's Proposed Class Includes Individuals Who Redeemed MFS Funds Shares, And Does Not Exclude Investors Who Purchased Such Shares.

Plaintiff argues that SLUSA's requirements are not met because Plaintiff "limits the proposed class to 'holders' of Class B shares," and therefore his claim "does not arise 'in connection with the purchase or sale' of B shares of MFS mutual funds." Pl. Mem. at 5. Yet the class definition necessarily includes investors who redeemed MFS fund shares, and does not exclude investors who purchased such shares, thereby bringing this case squarely within the scope of SLUSA preemption.

While Plaintiff claims his case is brought on behalf of "holders" of Class B shares, the class definition includes all such investors required to pay a CDSC "in the event they redeem such shares prior to the expiration of 6 years from purchase *or have been assessed* a CDSC for redeeming such shares on or after December 8, 2003." Compl. ¶ 9 (emphasis added). The Complaint further alleges that some putative class members already "have been . . . required to pay a significant sales charge." *Id.* ¶ 25.

As a consequence, the class necessarily includes individuals who have "sold" their shares, and who were assessed the charge that Plaintiff now claims should not have applied due to Defendants' alleged misconduct. Compl. ¶¶ 1, 2, 20, 25, 26. Indeed, Plaintiff's claim for relief also includes a plea for money damages to compensate these individuals for the CDSCs they paid. *Id.* at 9 (demand that Defendants pay "each Class member their actual damages").

In addition, the putative class alleged in the Complaint could potentially include MFS fund purchasers as well. Because the only requirement for membership in the putative class is that the shareholder held shares of a Fund subject to a CDSC as of December 8, 2003, the class could also include investors who purchased their such shares (directly or through dividend reinvestment) during the class period. Indeed, it is an established fact that the vast majority of mutual fund investors reinvest their dividends by purchasing additional shares of the same fund.[6]

Including in the class investors who sold shares (and paid the disputed CDSC), and failing to exclude from the class investors who purchased shares (or purchased additional shares) during the class period, brings Plaintiff's claim within the scope of SLUSA preemption. As Judge Stearns has held, "[i]f a class representative could give purchasers and sellers a free ride by salting into the class a member or two with holding claims, it would be a rare case in which SLUSA applied at all." *Cape Ann Investors LLC v. Lepone,* 296 F. Supp. 2d 4, 12 n.6 (D. Mass. 2003) (SLUSA applies because class includes both purchasers and holders and complaint "offers no means of distinguishing" between the two).

Also on point is *Kircher,* where the putative class was defined as all investors in certain mutual funds who held their shares between two specified dates. 403 F.3d at 482. According to the Seventh Circuit, "[a]s an effort to evade SLUSA, this class definition is a flop: some of the investors who held shares during the class period must have purchased their interest (or increased it) during that time, others, who owned shares at the beginning of the period, undoubtedly sold some or all of their investment during the window. Each of the funds has substantial daily

---

[6]    *See* O'Neal, Purchase and Redemption Patterns of US Equity Mutual Funds, *Financial Management* 63 (Apr. 1, 2004) (almost 90% of mutual fund investors automatically reinvest dividends). Dividend reinvestments generally are considered "purchases" under the securities laws. *See Deutschman v. Beneficial Corp.,* 761 F. Supp. 1080, 1087 (D. Del. 1991).

turnover, so the class of 'all holders' during even a single day contains many purchasers and

sellers.  All of these class actions therefore must be dismissed."  *Id.*

Other cases reach the same result based on similar allegations.  For example, in *Rowinski,*

the plaintiff claimed the defendants breached their contract with investors by providing biased

investment advice, and sought to recover "all fees and charges collected" for that advice.  398

F.3d at 297.  The plaintiff argued that "investment research is not necessarily disseminated in

connection with the purchase and sale of securities, citing investors who 'hold,' rather than

purchase or sell, the recommended securities."  *Id.* at 303.  The court rejected this argument, and

held the claim preempted by SLUSA, because the plaintiff's class definition was not "limited to

non-purchasers and non-sellers, and it necessarily encompasses claims by . . . [investors] who

purchased or sold the misrepresented securities."  *Id.  See also Dabit,* 395 F.3d at 45-46

(Complaint did not limit class to investors who purchased securities before misrepresentations,

and nothing in complaint excluded claims for damages from purchases thereafter); *Professional*

*Mgmt. Assoc.*, 335 F.3d at 803 (because complaint alleged misrepresentations beginning in 1994

and class members both bought and held shares later, complaint implicitly alleged

misrepresentations in connection with the purchase of securities); *Riley,* 292 F.3d at 1345

(SLUSA applies when claim "sweeps within its ambit actual purchases or sales of stock"); *In re*

*Worldcom, Inc.,* 263 F. Supp. 2d 745, 771 (S.D.N.Y. 2003) (SLUSA applies when class

definition did not "distinguish between purchasers and holders).[7]

---

[7]      Nor are Plaintiff's cases to the contrary.  *See, e.g., Green v. Ameritrade, Inc*., 279 F.3d 590, 598-99 & n.7
(8th Cir. 2002) (no claim by any seller of securities, and express disclaimer of damages arising from any stock
transactions); *Feitelberg v. Credit Suisse First Boston LLC*, 2003 WL 22434098, *4-5 (N.D. Cal. 2003) (same);
*Shaev v. Claflin*, 2001 WL 548567, *4-5 (N.D. Cal 2001) (claim that new stock options diluted value of shares held
by *existing* owners of stock); *Gordon v. Buntrock*, 2000 WL 556763, *1 (N.D. Ill. 2000) (class composed of
investors who bought stock *before* and held stock until *after* period when misrepresentations made).

### 3. Plaintiff Could Not Avoid Preemption By Limiting Class To "Holders" Because SLUSA Covers All Claims That Coincide With Purchases Or Sales Of Securities.

Even if Plaintiff had limited his claim to "holders," which he did not, it would still be preempted because SLUSA covers all claims of misconduct "in connection with" the purchase and sale of securities, not just claims asserted by individuals who themselves have purchased and sold. The opinion in *Kircher* makes this clear.

In *Kircher*, investors sued several investment companies for failing to ensure that their funds' share prices were set accurately each day. This allegedly allowed market timers to buy shares when they were overpriced and sell shares when they were underpriced, thereby "diverting gains from the mutual funds' long-term investors." 403 F.3d at 481. Several cases were consolidated for the appeal, and in all but one the plaintiffs implicitly had alleged that their purchases coincided with certain misrepresentations and omissions by the defendants regarding market timing. *Id.* 482-83. As discussed above, the court of appeals found these allegations sufficient to bring the cases within the scope of SLUSA. *Id.*

In the remaining case, however, plaintiffs had "define[d] the class as all investors who held the fund's securities during a defined period and neither purchased nor sold shares during that period." *Kircher,* 403 F.3d at 483. The Seventh Circuit found the case was nevertheless preempted by SLUSA. According to the court, the "in connection with" language of SLUSA has the same meaning as the same language in Section 10(b) of the Securities Exchange Act of 1934, the purpose of which is to "ensure[] that the fraud occurs in securities transactions rather than some other activity." *Id.* (citing *SEC v. Zandford,* 535 U.S. 813, 821-22 (2002)). That language, moreover, includes no requirement that a plaintiff "purchased or sold securities," and thus no such limitation exists on the cases that are preempted by SLUSA. *Id.* While the court recognized that, in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975), the Supreme

Court had limited the private right of action under Section 10(b) of the Exchange Act to claims brought by purchasers and sellers of securities, it held that later cases decided by the Supreme Court made clear that the language of Section 10(b) itself was not so limited. *Id.* at 483-84 (citing *United States v. O'Hagan,* 521 U.S. 642, 664 (1997), *Holmes v. SIPC,* 503 U.S. 258, 284 (1992), and *United States v. Naftalin,* 441 U.S. 768, 774 n.6 (1979)).

As discussed above, Plaintiff's efforts to avoid SLUSA preemption by alleging that his claim is brought exclusively on behalf of "holders" are undermined by the allegations in his own Complaint. Nor could those efforts succeed in any event because, under *Kircher,* SLUSA preempts claims of misconduct "in connection with the purchase or sale of securities" regardless of whether the plaintiffs bought and sold the securities involved. As the Seventh Circuit held in *Kircher,* "plaintiffs' effort to define non-purchaser-non-seller classes is designed to evade PSLRA in order to litigate a securities class action in state court in the hope that a local judge or jury may produce an idiosyncratic award. It is the very sort of maneuver that SLUSA is designed to prevent." *Kircher,* 403 F.3d at 484. The same is true in this case.

## II.    The Complaint Presents Substantial Federal Questions.

The Motion to Remand should also be denied because the Complaint presents substantial federal questions over which this Court has jurisdiction.

While Plaintiff argues that the Investment Company Act of 1940 ("ICA") "does not preempt state law claims," Pl. Mem. at 7, removal is not limited to cases where a federal statute expressly authorizes it. Instead, a state law claim may still "arise under" federal law when its resolution requires the determination of a substantial question of federal law. *Rossello-Gonzalez v. Calderon-Serra,* 398 F.3d 1, 12-13 (1st Cir. 2004); *see also Franchise Tax Bd. v. Constr.*

*Laborers Vacation Trust*, 463 U.S. 1, 13 (1983) (claim arises under federal law if the plaintiff's "right to relief under state law requires the resolution of a substantial question of federal law").[8]

First, resolution of Plaintiff's claim requires a determination of whether Defendants have committed any "wrongdoing" under federal law. As discussed above, Plaintiff's claim of breach is expressly founded on the allegations contained in the SEC consent orders. It is the "litany of findings constituting misconduct" in these orders that Plaintiff says relieves him of his obligation to pay the CDSC. Compl. ¶ 3, 23, 26, 31. State law claims founded on alleged violations of federal law raise substantial federal questions. *See, e.g., D'Alessio v. New York Stock Exchange, Inc.,* 258 F.3d 93, 101-02 (2d Cir.) (where "central premise" of claim is "rooted in violations of federal law . . . [and] requires court to construe federal securities laws . . . . the federal issue is substantial"), *cert. denied*, 534 U.S. 1066 (2001); *Marcus v. AT&T Corp.,* 138 F.3d 46, 55-56 (2d Cir. 1998) (state law breach of warranty claim that seeks enforcement of tariff agreements created under federal law); *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 827 (2d Cir. 1964) ("Even though the claim is created by state law, a case may 'arise under' a law of the United States if the complaint discloses a need for determining the meaning or application of such a law.").

Second, any resolution of Plaintiff's claim would require a court to construe the SEC Order, and granting Plaintiff the remedy he seeks would potentially conflict with it. Indeed, that Order expressly requires payment "to the mutual funds and their shareholders to compensate fairly and proportionately the funds' shareholders for losses attributable to late trading and other market timing activity during the relevant period" SEC Feb. 5, 2004 Order (Ex. 2) at § IV.C.1,

---

[8]    Plaintiff's cases are irrelevant to this question. *Burks v. Lasker*, 441 U.S. 471 (1979), says nothing about removal jurisdiction. Instead, it holds that the rights of mutual fund trustees to consider whether to dismiss a shareholder derivative suit brought under the ICA are governed under state, not federal, law. *Id.* at 486. *Green v. Fund Asset Mgmt., L.P.,* 245 F.3d 214 (3d Cir. 2001), merely holds that state law breach of fiduciary duty claims do not interfere with the legislative goals behind § 36(b) of the ICA. *Id.* at 223.

and require a further payment of $50 million over and above the actual, calculated restitutionary amount. SEC Feb. 5, 2004 Order (Ex. 2) at § IV.S. The order makes no provision for the cancellation of Class B shareholders' obligation to pay the CDSC. Indeed, granting such relief would provide Plaintiff and the putative class with a double recovery, and conflict with the intent of the consent orders to fully compensate shareholders for their losses. For this reason, too, Plaintiff's claim presents a substantial federal question that warrants removal. *See, e.g., Sable v. General Motors Corp.,* 90 F.3d 171, 175 (6th Cir. 1996).

Finally, Plaintiff's claim threatens to undermine key elements of federal law regarding the sale of mutual fund shares. Indeed, while Plaintiff claims that the CDSC is a "penalty" that shareholders have to pay, *see* Compl. ¶¶ 2, 20, it is actually a means through which financial intermediaries are compensated for services relating to the distribution of mutual fund shares. *See ING Funds,* 2005 WL 1107072, at *1. More importantly, the CDSC is part of an extensive body of federal law through which mutual fund shares are marketed. That body of law, which is rooted in the ICA, *see* 15 U.S.C. § 80a-22, and applicable to sales of mutual funds nationwide, *see* 17 C.F.R. §§ 270.12b-1, 270.22d-1, includes detailed rules for disclosing and assessing sales loads, including CDSCs. These rules ensure that sufficient resources are generated to pay the cost of distributing fund shares, and that Class B shareholders, who pay no front-end sales load when they purchase their shares, understand that they may be required to pay a CDSC upon redemption instead. *Id. See also* NASD, Inc., NASD Manual (CCH) § 2830 (2005). The rules also require that loads be applied equally within share classes, or pursuant to uniform scheduled variations, and consistent with disclosures to shareholders. *Id. See also* 15 U.S.C. § 80a-22(d); 17 C.F.R. § 270.22d-1. Plaintiff effectively seeks to exempt himself (and the putative class)

from this carefully constructed regulatory scheme based on allegations of market timing in the MFS funds.

Through the PSLRA, SLUSA and the National Securities Markets Improvements Act of 1996 ("NSMIA"), "Congress intended to provide national, uniform standards for the securities markets and nationally marketed securities." *Lander,* 251 F.3d at 111. The federal regulatory regime governing the distribution of mutual fund shares leaves no room for inconsistent, *ad hoc* exemptions and carve-outs, particularly on claims for alleged misconduct that the SEC has already ensured will be completely remedied. For this reason, Plaintiff's claim "necessarily depends on resolution of a substantial question of federal law," and is removable under 28 U.S.C. § 1441 in addition to SLUSA. *See Franchise Tax Bd.,* 463 U.S. at 8-9; *see also Myers v. Merrill Lynch & Co.,* 1999 WL 696082 (N.D. Cal. 1999) (NSMIA preempts claims under state statutes that conflict with federal securities rules), *aff'd*, 249 F.3d 1087 (9th Cir. 2001).

## III.    This Case Is Distinguishable from *Meyer v. Putnam International Voyager Fund*.

Last year, in *Meyer v Putnam International Voyager Fund,* 220 F.R.D. 127 (D. Mass. 2004), Judge Young ruled that SLUSA did not preempt "market timing" claims made by other plaintiffs against certain Putnam investment companies, and that the federal questions presented in the claims were not substantial enough to warrant removal. That ruling is distinguishable.

As in this case, the dispositive issue in *Meyer* with respect to SLUSA was whether the plaintiffs' claims were "in connection with" the purchase and sale of securities.[9] There, as here, the plaintiffs claimed solely to be "holders" of mutual fund shares. 220 F.R.D. at 129. However, that case involved claims that the defendants had allowed market timers to "capture[] an

---

[9]    The plaintiffs in *Meyer* also argued that their complaint did not include any claims of "misrepresentation or omission." 220 F.R.D. at 129 n.1. While Judge Young's ruling on the "in connection with" requirement meant that he did not have to consider this argument, he noted that references in the complaint to "unsuspecting" class members, and the defendants' policy against market timing "might be fairly construed as "the 'allegations of misrepresentations or omissions' that Meyer denies making." *Id.*

arbitrage profit which comes dollar-for-dollar out of the pockets of long-term investors," which the plaintiffs claimed harmed them by reducing the value of the shares they held. *See Meyer Complaint*, No. 03-12214-WGY, ¶¶ 29, 79 (available on PACER) ("Plaintiff and the other members of the Class have been injured by defendants' wrongdoing . . . because . . . the NAV or price of shares of [Plaintiff's funds] were lower than they might have otherwise been."). In contrast, the claim in the instant case involves fees that were agreed to as part of Plaintiff's *purchase* of his shares, and the harm alleged arises only when Plaintiff *redeems* those shares. Therefore, unlike the claim in *Meyer*, Plaintiff's claim here is *necessarily* "connected to" both purchase and sale of securities. *See Dabit*, 395 F.3d at 48.

Nor did the plaintiffs in *Meyer* expressly rely on any purchases or redemptions of mutual fund shares in asserting their claims. In contrast, Plaintiff here expressly bases his claim of breach on "substantial *redemptions* by shareholders . . . [and] increased outflow of shareholder funds" resulting from those redemptions. Compl. ¶ 3 (emphasis added). Hence, Plaintiff's claim here "coincides with" securities transactions.

The court in *Meyer* also found that the language in Meyer's complaint was "sufficiently clear to exclude claims asserted in connection with the purchase or sale of the Funds." *Id.* at 129. The court's understanding on this point was enhanced by the fact that Meyer, in his motion to remand, had expressly renounced any claim "that plaintiff bought or sold covered securities in reliance on defendants' alleged misrepresentations." *Id.* In this case, the Complaint expressly *includes* claims by shareholders who have already been assessed a CDSC, and does not *exclude* claims by shareholders who purchased shares (or additional shares) after October 28, 2003.

*Meyer* was also decided before the recent rulings in *Kircher*, *Rowinski*, and *Dabit*. As discussed above, these cases all counsel that courts should carefully review purported state law

claims to determine whether they encompass claims by purchasers or sellers of securities. Indeed, under *Kircher*, the critical issue is whether the alleged misconduct coincides with the purchase or sale of securities, and not whether it coincides with a plaintiff's purchase and sale.

With respect to federal question removal, Judge Young found that, at most, federal law provided a "element" of the plaintiff's state law cause of action. 220 F.R.D. at 130. In this case, Plaintiff relies entirely on the violation of federal law as the basis for his claim, and the relief he seeks would both interfere with federal consent orders designed to remedy the harms he alleges and graft an *ad hoc* exception on to the federal body of law regarding the distribution of mutual fund shares. None of these issues were factors in *Meyer.*

## <u>CONCLUSION</u>

For the reasons set forth herein and in defendants' Notice of Removal, plaintiff's Motion to Remand should be denied.

Dated: June 20, 2005                       Respectfully submitted,

/s/ Jane E. Willis_____
John D. Donovan, Jr. (BBO#130950)
Jane E. Willis (BBO# 568024)
Carisa Klemeyer
ROPES & GRAY LLP
One International Place
Boston, MA  02110-0624
Telephone: (617) 951-7000
Fax: (617) 951-7050

Thomas B. Smith
ROPES & GRAY LLP
One Metro Center
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
Telephone: (202) 508-4600
Fax: (202) 508-4650

Counsel for ALL DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served on the attorney of record for each party in this matter by filing the document electronically with this Court, using the Court's ECF filing system, on this 20th day of June, 2005.

/s/  Jane E. Willis____
Jane E. Willis

# EXHIBIT 1

# UNITED STATES OF AMERICA
# JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

CHAIRMAN:
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

MEMBERS:
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

DIRECT REPLY TO:

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888

http://www.jpml.uscourts.gov

June 14, 2005

## NOTICE OF HEARING SESSION

Dear Counsel:

Pursuant to the order of the Judicial Panel on Multidistrict Litigation filed today, you are hereby notified that a hearing session has been scheduled to consider various matters pursuant to 28 U.S.C. § 1407.

DATE OF HEARING SESSION:          July 28, 2005

LOCATION OF HEARING SESSION:      Alfred A. Arraj United States Courthouse
                                  Judge Babcock's Courtroom, Second Floor
                                  901 19th Street
                                  Denver, Colorado 80202

TIME OF HEARING SESSION: In those matters designated for oral argument, counsel presenting oral argument must be present at **8:30 a.m.** in order for the Panel to allocate the amount of time for oral argument. Oral argument will commence at **9:30 a.m.**

Please direct your attention to the enclosed Hearing Session Order and Schedule of Matters for Hearing Session for a listing of the matters scheduled for consideration at this hearing session.

- Section A of this Schedule lists the matters designated for oral argument.
- Section B of this Schedule lists the matters that the Panel has determined to consider **without oral argument**, pursuant to Rule 16.1(c), R.P.J.P.M.L., 199 F.R.D. 425, 439 (2001).

For those matters listed on Section A of the Schedule, the enclosed blue "Notice of Presentation or Waiver of Oral Argument" must be returned to this office no later than **July 11, 2005.** Note the procedures governing Panel oral argument which are outlined on the enclosed "Procedures for Oral Argument before the Judicial Panel on Multidistrict Litigation." These procedures are strictly adhered to and your cooperation is appreciated.

Very truly,

Michael J. Beck

Michael J. Beck
Clerk of the Panel

c:  Clerk, U.S. District Court for the District of Colorado

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

JUNE 14, 2005

MICHAEL J. BECK
CLERK OF THE PANEL

# *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL*

## HEARING SESSION ORDER

IT IS ORDERED that on July 28, 2005, a hearing session will be held in Denver, Colorado, to consider the matters on the attached Schedule under 28 U.S.C. § 1407.

IT IS FURTHER ORDERED that at said hearing session the Panel may, on its own initiative, consider transfer of any or all of the actions in those matters to any district or districts.

IT IS FURTHER ORDERED that at said hearing session the matters listed on Section A of the attached Schedule shall be designated for oral argument.

IT IS FURTHER ORDERED that at said hearing session the matters listed on Section B of the attached Schedule shall be considered without oral argument, pursuant to Rule 16.1(c), R.P.J.P.M.L., 199 F.R.D. 425, 439 (2001).  The Panel reserves the prerogative, on any basis including submissions of parties pursuant to Panel Rule 16.1(b), to issue a subsequent notice designating any of those matters for oral argument.

IT IS FURTHER ORDERED that the Clerk of the Judicial Panel on Multidistrict Litigation shall direct notice of this hearing session to counsel for all parties involved in the matters on the attached Schedule.

FOR THE PANEL:

_Wm. Terrell Hodges_
Wm. Terrell Hodges
Chairman

SCHEDULE OF MATTERS FOR HEARING SESSION
July 28, 2005 -- Denver, Colorado


**SECTION A**
**MATTERS DESIGNATED FOR ORAL ARGUMENT**


MDL-1690 -- In re Indian Tribes Contract Support Costs Litigation

Motion of plaintiffs Tunica-Biloxi Tribe of Louisiana, et al., for centralization of the following actions in the United States District Court for the District of New Mexico:

District of District of Columbia

*Tunica-Biloxi Tribe of Louisiana, et al. v. United States of America, et al.,*
C.A. No. 1:02-2413

District of New Mexico

*Ramah Navajo Chapter v. Manuel Lujan, et al.,* C.A. No. 1:90-957
*Pueblo of Zuni v. United States of America, et al.,* C.A. No. 1:01-1046


MDL-1691 -- In re Bextra and Celebrex Products Liability Litigation
MDL-1693 -- In re Bextra Marketing and Sales Practices Litigation
MDL-1694 -- In re Celebrex Marketing and Sales Practices Litigation
MDL-1699 -- In re Bextra and Celebrex Marketing, Sales Practices and Products Liability
              Litigation

Motion of plaintiffs Gloria Ward, Carol J. Aiola, and Ronald J. Babin for centralization of certain of the following actions in MDL-1691 in the United States District Court for the Eastern District of Louisiana; motion of plaintiffs Kenneth Kaye, et al., and Irene Bailey, et al., for centralization of certain of the following actions in MDL-1691 in the United States District Court for the District of Connecticut; motion of plaintiff ASEA/AFSCME Local 52 Health Benefits Trust for centralization of certain of the following actions in MDL-1693 in the United States District Court for the Southern District of New York; motion of plaintiffs Health Care for All, et al., for centralization of certain of the following actions in MDL-1694 in the United States District Court for the District of Massachusetts; and motion of plaintiffs Betty A. Alexander, et al., for centralization of the following actions in MDL-1699 in the United States District Court for the Eastern District of Louisiana:

Schedule of Matters for Hearing Session, Section A                          p. 2
Denver, Colorado


MDL-1691, 1693, 1694, and 1699 (Continued)


     Northern District of Alabama

   *Darryl Blue, etc. v. Pfizer, Inc.*, C.A. No. 2:05-464
   *Martha Ann Lemond, et al. v. Merck & Co., Inc., et al.*, C.A. No. 7:05-691

     District of Arizona

   *Dorothy Greaves v. Pfizer, Inc., et al.*, C.A. No. 2:05-647

     Central District of California

   *John Bolwell, et al. v. Pfizer, Inc.*, C.A. No. 2:05-1967

     Northern District of California

   *June Swan, et al. v. Pfizer, Inc., et al.*, C.A. No. 3:05-834

     District of Connecticut

   *Kenneth Kaye, et al. v. Pfizer Inc.*, C.A. No. 3:05-385
   *Irene Bailey, et al. v. Pfizer, Inc., et al.*, C.A. No. 3:05-386

     District of Delaware

   *Ronnie L. Hatcher v. Pfizer, Inc., et al.*, C.A. No. 1:05-208

     Northern District of Florida

   *Marie McConnell v. Pfizer, Inc.*, C.A. No. 3:05-123

     Southern District of Florida

   *Aurora Balloveras v. Pfizer, Inc.*, C.A. No. 1:05-20429

Schedule of Matters for Hearing Session, Section A                    p. 3
Denver, Colorado


MDL-1691, 1693, 1694, and 1699 (Continued)


### Eastern District of Louisiana

*Gloria Ward v. Pfizer, Inc.*, C.A. No. 2:04-3469
*Elmer E. Creel, Sr., et al. v. Pfizer, Inc.*, C.A. No. 2:04-3470
*Carol J. Aiola v. Pfizer, Inc.*, C.A. No. 2:05-1207
*Ronald J. Babin v. Pfizer, Inc.*, C.A. No. 2:05-1208
*Deborah Ann Woodberry v. Pfizer, Inc.*, C.A. No. 2:05-1350
*Terry Bridges v. Pfizer, Inc.*, C.A. No. 2:05-1353
*George Hoffman v. Pfizer, Inc.*, C.A. No. 2:05-1354
*Helen Anne Todini v. Pfizer, Inc.*, C.A. No. 2:05-1367
*Betty A. Alexander, et al. v. Pfizer, Inc.*, C.A. No. 2:05-1720

### Middle District of Louisiana

*Ronald W. Abel, etc. v. Pfizer, Inc.*, C.A. No. 3:05-258

### Western District of Louisiana

*William Doss Turner v. Pfizer, Inc.*, C.A. No. 1:05-619
*Yvonne Clark v. Pfizer, Inc.*, C.A. No. 1:05-620

### District of Massachusetts

*Health Care for All, et al. v. Pfizer, Inc., et al.*, C.A. No. 1:05-10707

### Eastern District of Michigan

*Linda A. Watters, et al. v. Pfizer, Inc., et al.*, C.A. No. 2:05-71434

### District of Minnesota

*Loretta M. Harris v. Pfizer, Inc.*, C.A. No. 0:05-728

### Eastern District of New York

*Melissa Kelly, et al. v. Pfizer, Inc.*, C.A. No. 1:05-949

Schedule of Matters for Hearing Session, Section A                    p. 4
Denver, Colorado

MDL-1691, 1693, 1694, and 1699 (Continued)

### Southern District of New York

*ASEA/AFSCME Local 52 Health Benefits Trust v. Pfizer, Inc., et al.*,
    C.A. No. 1:05-3803
*Steamfitters' Industry Welfare Fund, et al. v. Pfizer, Inc., et al.*, C.A. No. 1:05-3814
*Sheet Metal Workers' International Assn. v. Pfizer, Inc., et al.*, C.A. No. 1:05-4125

### Northern District of Ohio

*Theresa Blatnik, et al. v. Pfizer, Inc.*, C.A. No. 1:05-900

### Northern District of Texas

*James Booker v. Merck & Co., Inc., et al.*, C.A. No. 3:05-496

### Southern District of Texas

*Ronald L. Baker, et al. v. Pfizer, Inc.*, C.A. No. 3:05-206

MDL-1692 -- In re Norvir Antitrust Litigation

    Motion of plaintiff Gary Schor for centralization of the following actions in the United States District Court for the Northern District of Illinois or, in the alternative, the United States District Court for the Northern District of California:

### Northern District of California

*John Doe 1, et al. v. Abbott Laboratories*, C.A. No. 4:04-1511
*Service Employees International Union Health & Welfare Fund v. Abbott Laboratories*,
    C.A. No. 4:04-4203

### Northern District of Illinois

*Gary Schor v. Abbott Laboratories*, C.A. No. 1:05-1592

Schedule of Matters for Hearing Session, Section A                    p. 5
Denver, Colorado

MDL-1695 -- In re Veeco Instruments Inc. Securities Litigation

Motion of defendants Veeco Instruments Inc.; Edward H. Braun; and John F. Rein, Jr., for centralization of the following actions in the United States District Court for the Southern District of New York:

Eastern District of New York

*Andrew McIntosh v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-889
*Barry Linzer v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-957
*Bruce Kantor v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-967
*George Walker v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1003
*Philip G. Collins v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1277
*Servaas Holthuizen v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1337
*Gerald J. Vogt, et al. v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1430
*Timothy Joe Grove v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1552

Southern District of New York

*L.I.S.T., Inc. v. Veeco Instruments Inc., et al.*, C.A. No. 7:05-2189
*Roy P. Kershaw v. Veeco Instruments Inc., et al.*, C.A. No. 7:05-2929

MDL-1696 -- In re Sierra Wireless, Inc., Securities Litigation

Motion of plaintiff Jonathan Epstein for centralization of the following actions in the United States District Court for the Southern District of New York:

Southern District of California

*W. Robert Goodman v. Sierra Wireless, Inc., et al.*, C.A. No. 3:05-262
*Milton A. Karetas v. Sierra Wireless, Inc., et al.*, C.A. No. 3:05-270

Southern District of New York

*J. John Lawler v. David B. Sutcliffe, et al.*, C.A. No. 1:05-1299
*Gail Beach v. Sierra Wireless, Inc., et al.*, C.A. No. 1:05-1797
*Jonathan Epstein v. Sierra Wireless, Inc., et al.*, C.A. No. 1:05-1924

Schedule of Matters for Hearing Session, Section A                    p. 6
Denver, Colorado


MDL-1696 (Continued)


Southern District of New York (Continued)

*Candido M. Rodrigues v. Sierra Wireless, Inc., et al.*, C.A. No. 1:05-1925
*Kenneth Bender v. David B. Sutcliffe, et al.*, C.A. No. 1:05-2304
*Frederick A. Nuttall v. Sierra Wireless, Inc., et al.*, C.A. No. 1:05-2378
*Jonathan B. Rodnon v. David B. Sutcliffe, et al.*, C.A. No. 1:05-3029


MDL-1697 -- In re Air Crash Near Yarmouth, Massachusetts, on August 26, 2003

Motion of Colgan Air, Inc., for centralization of the following actions in the United States District Court for the Eastern District of Virginia:


District of Massachusetts

*Yisel Dean, etc. v. Raytheon Co., et al.*, C.A. No. 1:05-10155
*Lisa A. Weiler, etc. v. Raytheon Co., et al.*, C.A. No. 1:05-10364

Eastern District of Virginia

*Colgan Air, Inc. v. Raytheon Aircraft Co.*, C.A. No. 1:05-213


MDL-1698 -- In re American General Life & Accident Insurance Co. Retiree Benefits "ERISA" Litigation

Motion of defendant American General Life & Accident Insurance Company for centralization of the following actions in the United States District Court for the District of South Carolina:


Northern District of Alabama

*Donnie Pope, et al. v. American General Life & Accident Insurance Co.*,
    C.A. No. 7:05-109

Schedule of Matters for Hearing Session, Section A                          p. 7
Denver, Colorado


MDL-1698 (Continued)


      Middle District of Florida

    *Eleanor M. Acres, et al. v. American General Life & Accident Insurance Co.*,
      C.A. No. 3:04-1274
    *June Appling, et al. v. American General Life & Accident Insurance Co.*,
      C.A. No. 3:05-258

      Southern District of Georgia

    *Herschel A. Adair, et al. v. American General Life & Accident Insurance Co.*,
      C.A. No. 1:04-192
    *Paul A. Flanigan v. American General Life & Accident Insurance Co.*, C.A. No. 1:05-51


      District of South Carolina

    *Raymond L. Addison, et al. v. American General Life & Accident Insurance Co.*,
      C.A. No. 3:04-23427

      Middle District of Tennessee

    *Rolly Edward Thompson, et al. v. American General Life & Accident Insurance Co.*,
      C.A. No. 3:05-228


MDL-1700 -- In re FedEx Ground Package System, Inc., Employment Practices Litigation
      (No. II)

    Motion of defendant FedEx Ground Package System, Inc., for centralization of the following
actions in the United States District Court for the Western District of Pennsylvania:


      Northern District of California

    *Dean Alexander, et al. v. FedEx Ground Package System, Inc., et al.*, C.A. No. 3:05-38

Schedule of Matters for Hearing Session, Section A                    p. 8
Denver, Colorado


MDL-1700 (Continued)


<u>Northern District of Illinois</u>

*Michael Griffin, et al. v. FedEx Corp., et al.*, C.A. No. 1:05-2326

<u>District of Kansas</u>

*Carlene M. Craig, et al. v. FedEx Ground Package System, Inc.*, C.A. No. 5:03-4197

<u>District of Massachusetts</u>

*Edward Sheehan, et al. v. FedEx Corp., et al.*, C.A. No. 1:05-10936

<u>Eastern District of Michigan</u>

*James Lester, et al. v. Federal Express Corp., et al.*, C.A. No. 1:04-10055

<u>District of Minnesota</u>

*Katrina Lee, et al. v. FedEx Corp., et al.*, C.A. No. 0:05-814

<u>District of New Hampshire</u>

*Robert Gennell, Jr., et al. v. FedEx Corp., et al.*, C.A. No. 1:05-145

<u>District of New Jersey</u>

*Jessie Capers, et al. v. FedEx Ground, et al.*, C.A. No. 2:02-5352
*Michael B. Kilmartin v. Federal Express, Inc., et al.*, C.A. No. 3:05-2028

<u>Eastern District of New York</u>

*Curtis Johnson, et al. v. FedEx Home Delivery, et al.*, C.A. No. 1:04-4935

<u>Southern District of New York</u>

*Larry Louzau, et al. v. FedEx Ground Package System, Inc.*, C.A. No. 1:04-9795

Schedule of Matters for Hearing Session, Section A                    p. 9
Denver, Colorado


MDL-1700 (Continued)


#### District of South Dakota

*Kimberly A. Bunger, et al. v. FedEx Ground Package System, Inc., et al.*,
   C.A. No. 4:05-4056

#### Western District of Texas

*John Humphreys, et al. v. Federal Express Corp., et al.*, C.A. No. 1:05-155

#### Eastern District of Virginia

*Bradley D. Gregory v. FedEx Corp., et al.*, C.A. No. 2:03-479

#### Western District of Washington

*Randy Anfinson, et al. v. FedEx Ground Package System, Inc., et al.*, C.A. No. 2:05-119


MDL-1701 -- In re Sumatriptan Succinate Patent Litigation

Motion of plaintiff Glaxo Group, Ltd., for centralization of the following actions in the United States District Court for the Southern District of New York:


#### District of Delaware

*Glaxo Group, Ltd. v. Spectrum Pharmaceuticals, Inc.*, C.A. No. 1:05-99

#### Southern District of New York

*Glaxo Group, Ltd. v. Dr. Reddy's Laboratories, Ltd., et al.*, C.A. No. 1:03-10260
*Glaxo Group, Ltd. v. Cobalt Pharmaceuticals, Inc.*, C.A. No. 1:04-9886

Schedule of Matters for Hearing Session, Section A                              p. 10
Denver, Colorado


MDL-1702 -- In re Air Crash Near Kirksville, Missouri, on October 19, 2004

     Motion of plaintiffs Jeffrey T. Diffenderfer, et al., for centralization of the following actions in the United States District Court for the Eastern District of Missouri:

       Eastern District of Missouri

*Everest National Insurance Co. v. Corporate Airlines, Inc.*, C.A. No. 4:05-60
*Jeffrey T. Diffenderfer, et al. v. Corporate Airlines, Inc., et al.*, C.A. No. 4:05-191
*A.D.M., et al. v. Corporate Airlines, Inc., et al.*, C.A. No. 4:05-245
*Susanne Wandel, etc. v. American Airlines, Inc., et al.*, C.A. No. 4:05-370
*Mary E. Sarantino, etc. v. American Airlines, Inc., et al.*, C.A. No. 4:05-445
*Diane Varidin, et al. v. American Airlines, Inc., et al.*, C.A. No. 4:05-555
*John E. Krogh, et al. v. Corporate Airlines, Inc., et al.*, C.A. No. 4:05-729
*E.M.W., et al. v. Corporate Airlines, Inc., et al.*, C.A. No. 4:05-730

       Northern District of Texas

*Karlene Ator, etc. v. American Airlines, Inc., et al.*, C.A. No. 3:05-159
*Alicia Talley, etc. v. American Airlines, Inc., et al.*, C.A. No. 3:05-160


MDL-1703 -- In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation

     Motion of defendant Sears, Roebuck & Co., for centralization of the following actions in the United States District Court for the Northern District of Illinois:

       Central District of California

*Guillermo Garcia Santamarina v. Sears, Roebuck & Co.*, C.A. No. 2:05-3039

       Southern District of Florida

*Jeffrey Greenfield v. Sears, Roebuck & Co.*, C.A. No. 1:05-21297

Schedule of Matters for Hearing Session, Section A                         p. 11
Denver, Colorado


MDL-1703 (Continued)


<u>Northern District of Illinois</u>

*Larry Steven Anderson, Jr., et al. v. Sears, Roebuck & Co.*, C.A. No. 1:05-2623
*Tammy Cyr v. Sears, Roebuck & Co.*, C.A. No. 1:05-2627
*Charles Chatham v. Sears, Roebuck & Co.*, C.A. No. 1:05-2852

<u>Eastern District of Missouri</u>

*Tracy Hutson v. Sears, Roebuck & Co.*, C.A. No. 4:05-760

Schedule of Matters for Hearing Session, Section B　　　　　　　　　　p. 12
Denver, Colorado

## SECTION B
## MATTERS DESIGNATED FOR CONSIDERATION WITHOUT ORAL ARGUMENT

MDL-875 -- In re Asbestos Products Liability Litigation (No. VI)

　　　Oppositions of plaintiffs to transfer of their respective following actions to the United States
District Court for the Eastern District of Pennsylvania:

Middle District of Louisiana

*William D. Hammons v. AMEC Construction Management, Inc., et al.,*
　　C.A. No. 3:04-855

District of Maryland

*Leroy Jackson v. John Crane-Houdaille, Inc., et al.,* C.A. No. 1:05-649

District of New Mexico

*Sinforosa Apodaca, et al. v. Zia Co., et al.,* C.A. No. 6:05-182

Southern District of New York

*Samuel P. Smith v. General Electric Co.,* C.A. No. 1:04-10102
*James Bernhardt, et al. v. General Electric Co.,* C.A. No. 1:04-10103

Western District of Pennsylvania

*Charles Simikian v. Pneumo Abex, LLC, et al.,* C.A. No. 2:05-229

Western District of Texas

*Kathy D. Sartalamacchia, et al. v. Alcoa, Inc.,* C.A. No. 6:05-90

Schedule of Matters for Hearing Session, Section B                           p. 13
Denver, Colorado


MDL-1200 -- In re Flat Glass Antitrust Litigation

   Opposition of defendant AFG Industries, Inc., to remand, under 28 U.S.C. § 1407(a), of the
following action to the United States District Court for the District of Oregon:


      Western District of Pennsylvania

   *JELD-WEN, Inc., et al. v. Asahi Glass Co., Ltd., et al.*, C.A. No. 2:99-875 (D. Oregon,
      C.A. No. 3:99-351)


MDL-1203 -- In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products
            Liability Litigation

   Oppositions of plaintiffs to transfer of their respective actions, listed on Attachment A, to
the United States District Court for the Eastern District of Pennsylvania.


MDL-1358 -- In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation

   Opposition of plaintiffs Edith Quick, et al., to transfer of the following action to the United
States District Court for the Southern District of New York:


      Central District of Illinois

   *Edith Quick, et al. v. Shell Oil Co., et al.*, C.A. No. 2:05-2072


MDL-1379 -- In re Literary Works in Electronic Databases Copyright Litigation

   Opposition of plaintiff Edward Roeder to transfer of the following action to the United States
District Court for the Southern District of New York:


      District of District of Columbia

   *Edward Roeder v. Tribune Co., Inc., et al.*, C.A. No. 1:04-1818

Schedule of Matters for Hearing Session, Section B                           p. 14
Denver, Colorado


MDL-1405 -- In re California Wholesale Electricity Antitrust Litigation

     Opposition of plaintiff Preferred Energy Services, Inc., to transfer of the following action to the United States District Court for the Southern District of California:

         Northern District of California

       *Preferred Energy Services, Inc. v. Reliant Energy Services, Inc., et al.,*
          C.A. No. 5:05-1435


MDL-1431 -- In re Baycol Products Liability Litigation

     Opposition of plaintiff Linda Baker, etc., to transfer of the following action to the United States District Court for the District of Minnesota:

         Southern District of Alabama

       *Linda Baker, etc. v. Bayer AG, et al.*, C.A. No. 1:03-687


MDL-1446 -- In re Enron Corp. Securities, Derivative & "ERISA" Litigation

     Opposition of plaintiffs Lon Wilkens, et al., to transfer of the following action to the United States District Court for the Southern District of Texas:

         Eastern District of Missouri

       *Lon Wilkens, et al. v. Merrill Lynch & Co., Inc., et al.*, C.A. No. 4:05-529

MDL-1456 -- In re Pharmaceutical Industry Average Wholesale Price Litigation

      Opposition of plaintiff County of Erie to transfer of the following action to the United States District Court for the District of Massachusetts:

            Western District of New York

        *County of Erie v. Abbott Laboratories, Inc., et al.*, C.A. No. 6:05-6203

MDL-1486 -- In re Dynamic Random Access Memory (DRAM) Antitrust Litigation

      Oppositions of plaintiffs John McKinnon, et al.; Thomas K. Maher; and Shelly Smith, et al., to transfer of their respective following actions to the United States District Court for the Northern District of California:

            District of Maine

    *John McKinnon, et al. v. Micron Technology, Inc., et al.*, C.A. No. 2:05-74

            Middle District of North Carolina

    *Thomas K. Maher v. Elpida Memory, Inc., et al.*, C.A. No. 1:05-225

            District of Vermont

    *Shelly Smith, et al. v. Micron Technology, Inc., et al.*, C.A. No. 2:05-99

Schedule of Matters for Hearing Session, Section B                              p. 16
Denver, Colorado

MDL-1507 -- In re Prempro Products Liability Litigation

     Oppositions of plaintiffs Irene Anderson, et al.; Kathi Porter, et al.; Grigorina Nikolchev, et al.; Karen Towle; Carol Schoenberg; and Carolyn Green to transfer of their respective following actions to the United States District Court for the Eastern District of Arkansas:

        Northern District of California

    *Irene Anderson, et al. v. Wyeth Pharmaceuticals, Inc., et al.*, C.A. No. 3:05-612
    *Kathi Porter, et al. v. Wyeth Pharmaceuticals, Inc., et* al., C.A. No. 3:05-613
    *Grigorina Nikolchev, et al. v. Wyeth Pharmaceuticals, Inc., et al.*, C.A. No. 4:05-611
    *Karen Towle v. Wyeth Pharmaceuticals, Inc., et al.*, C.A. No. 4:05-614
    *Carol Schoenberg v. Wyeth Pharmaceuticals, Inc., et al.*, C.A. No. 4:05-615

        Southern District of Mississippi

    *Carolyn Green v. Wyeth, Inc., et al.*, C.A. No. 3:04-877

MDL-1566 -- In re Western States Wholesale Natural Gas Antitrust Litigation

     Motion of defendants Reliant Energy Services, Inc.; Dynegy Marketing & Trade; The Williams Power Company, Inc.; CMS Marketing Services & Trading Company; Duke Energy Trading & Marketing, LLC; and AEP Energy Services, Inc., for transfer of the following action to the United States District Court for the District of Nevada:

        Western District of Tennessee

    *Samuel D. Leggett, et al. v. Duke Energy Corp., et al.*, C.A. No. 2:05-2177

Schedule of Matters for Hearing Session, Section B                              p. 17
Denver, Colorado

MDL-1586 -- In re Mutual Funds Investment Litigation

  Oppositions of plaintiffs Barbara R. Anding, Dean Delaventura, and Brian Reaves to transfer
of their respective following actions to the United States District Court for the District of Maryland:

    Eastern District of Arkansas

  *Barbara R. Anding v. Bank of America Corp., et al.*, C.A. No. 4:05-525

    District of Massachusetts

  *Dean Delaventura v. Columbus Acorn Trust, et al.*, C.A. No. 1:05-10793
  *Brian Reaves v. MFS Series Trust I, et al.*, C.A. No. 1:05-10804

MDL-1596 -- In re Zyprexa Products Liability Litigation

  Oppositions of plaintiffs Nancy Sires and Connie Brown, et al., to transfer of their respective
following actions to the United States District Court for the Eastern District of New York:

    Eastern District of Kentucky

  *Nancy Sires v. Eli Lilly & Co., et al.*, C.A. No. 5:05-117

    Northern District of Texas

  *Connie Brown, et al. v. Eli Lilly & Co., et al.*, C.A. No. 4:05-215

MDL-1604 -- In re Ocwen Federal Bank FSB Mortgage Servicing Litigation

Oppositions of plaintiffs Robert Harris, et al.; Wilfred Hinton; Albert Telfer; Sandra Sinegal; and Jeff Watson, et al., to transfer of their respective following actions to the United States District Court for the Northern District of Illinois:

Middle District of Alabama

*Robert Harris, et al. v. Ocwen Federal Bank, FSB*, C.A. No. 3:05-254

Northern District of Alabama

*Wilfred Hinton v. Ocwen Federal Bank, FSB, et al.*, C.A. No. 2:05-689

Central District of California

*Albert Telfer v. Moss, Codilis, Stawiarski, Morris, Schneider & Prior, LLP, et al.*, C.A. No. 5:05-138

Eastern District of Texas

*Sandra Sinegal v. Ocwen Federal Bank, FSB, et al.*, C.A. No. 1:05-246

Southern District of Texas

*Jeff Watson, et al. v. Ocwen Federal Bank, FSB*, C.A. No. 4:05-924

MDL-1629 -- In re Neurontin Marketing, Sales Practices and Products Liability Litigation

Oppositions of plaintiffs Ellen DeRosa and Mary Hansen to transfer of their respective following actions to the United States District Court for the District of Massachusetts:

District of New Hampshire

*Ellen DeRosa v. Pfizer, Inc., et al.*, C.A. No. 1:05-116

District of Vermont

*Mary Hansen v. Pfizer, Inc., et al.*, C.A. No. 1:05-100

Schedule of Matters for Hearing Session, Section B                    p. 19
Denver, Colorado

MDL-1631 -- In re Publication Paper Antitrust Litigation

Oppositions of plaintiffs Jorine Lowry; Beth Mahoney; and Shelly Smith, et al., to transfer of their respective following actions to the United States District Court for the District of Connecticut:

> ### District of Maine
>
> *Jorine Lowry v. International Paper Co., et al.*, C.A. No. 2:05-63
>
> ### District of New Hampshire
>
> *Beth Mahoney v. International Paper Co., et al.*, C.A. No. 1:05-120
>
> ### District of Vermont
>
> *Shelly Smith, et al. v. International Paper Co., et al.*, C.A. No. 2:05-93

MDL-1657 -- In re Vioxx Products Liability Litigation

Oppositions of plaintiffs to transfer of their respective following actions to the United States District Court for the Eastern District of Louisiana:

> ### Eastern District of California
>
> *Leonard Lagden v. Merck & Co., Inc., et al.*, C.A. No. 2:05-656
>
> ### Northern District of California
>
> *Vick Kargodorian v. Merck & Co., Inc., et al.*, C.A. No. 3:05-937
> *Nora Olson, et al. v. Merck & Co., Inc., et al.*, C.A. No. 3:05-1256
>
> ### Southern District of California
>
> *Robert V. Purcell v. Merck & Co., Inc., et al.*, C.A. No. 3:05-443

Schedule of Matters for Hearing Session, Section B                    p. 20
Denver, Colorado

MDL-1657 (Continued)

### District of Connecticut

*JoAnn Malek v. Eric Rosenberg, M.D., et al.*, C.A. No. 3:05-543

### Middle District of Florida

*Migna Serrano, et al. v. Merck & Co., Inc., et al.*, C.A. No. 6:05-170
*Conchita Merced-Torres, et al. v. Merck & Co., Inc., et al.*, C.A. No. 6:05-449
*Samuel Diaz, et al. v. Merck & Co., Inc., et al.*, C.A. No. 6:05-472
*Wayne Vigil, et al. v. Merck & Co., Inc., et al.*, C.A. No. 8:05-223

### Southern District of Illinois

*Helen Wood v. Merck & Co., Inc., et al.*, C.A. No. 3:05-168

### Eastern District of Missouri

*Curt Meng, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-194
*Ronald Colbert, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-195
*Carver Black, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-297
*John Hodges, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-302
*Renee Lockett, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-304
*LeJuana Young, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-309
*Kathryn Pueser, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-430
*Chris Piechoinski, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-431
*Lorraine Phillip, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-433
*Barbara O'Bannon, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-434
*Mary Miles, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-435
*Jeffrey McDaniel, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-436
*Louise McCarter, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-437
*Norma Hubbard, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-438
*Delores Holmes, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-439
*Terry Frame, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-440
*Jane Cavins, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-441
*Charlesetta Butler, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:05-442

MDL-1657 (Continued)

### Northern District of Ohio

*Kimberly Kaiser, et al. v. Merck & Co., Inc.*, C.A. No. 1:05-776

### Western District of Pennsylvania

*Mary Ellen Magnifico v. Merck & Co., Inc.*, C.A. No. 2:05-386

### Northern District of Texas

*James Booker v. Merck & Co., Inc., et al.*, C.A. No. 3:05-496

### Northern District of West Virginia

*William David Lough, et al. v. Merck & Co., Inc., et al.*, C.A. No. 5:05-34

### MDL-1663 -- In re Insurance Brokerage Antitrust Litigation

Oppositions of plaintiff KLLM, Inc., plaintiff Signum, LLC, defendant CV Starr & Company, and defendant Insurance Company of the State of Pennsylvania to transfer of their respective following actions to the United States District Court for the District of New Jersey:

### Southern District of Mississippi

*KLLM, Inc. v. Marsh USA, Inc., et al.*, C.A. No. 3:04-893

### District of South Carolina

*Signum, LLC v. AON Corp., et al.*, C.A. No. 4:05-528

**ATTACHMENT A TO THE JULY 28, 2005
SCHEDULE OF MATTERS FOR HEARING**

<u>MDL-1203 -- In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability
      Litigation</u>

### <u>Central District of California</u>

*Susan R. Burrows, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-5304
*Inga M. Hughes, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-5316
*Kathleen Koman-Fahey v. American Home Products Corp., et al.*, C.A. No. 2:04-5317
*Marilyn D. Evans, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-5318
*Sheila Briggs, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-7470
*Erma R. Boone, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-7474
*Claudia J. Bolding v. American Home Products Corp., et al.*, C.A. No. 2:04-7475
*Debra A. Brock v. American Home Products Corp., et al.*, C.A. No. 2:04-7480
*Elizabeth T. Kramer-Manter, et al. v. American Home Products Corp., et al.*,
   C.A. No. 2:04-7638
*Carol Lenz, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-7640
*Sharon E. Little v. American Home Products Corp., et al.*, C.A. No. 2:04-7641
*Maria L. Lopez v. American Home Products Corp., et al.*, C.A. No. 2:04-7642
*Jesse M. Logan, Jr. v. American Home Products Corp., et al.*, C.A. No. 2:04-7643
*Deborah A. St. Amand, et al. v. American Home Products Corp., et al.*, C.A. No. 2:04-8056
*Cynthia Y. Vaporis-Martinez, et al. v. American Home Products Corp., et al.*,
   C.A. No. 2:04-9709
*Betty Barton v. American Home Products Corp., et al.*, C.A. No. 2:05-139
*Carolyn J. Clammer, et al. v. American Home Products Corp., et al.*, C.A. No. 2:05-140
*Rufino Santiago, et al. v. American Home Products Corp., et al.*, C.A. No. 2:05-1238
*Deborah Bain v. American Home Products Corp., et al.*, C.A. No. 2:05-1239

### <u>Northern District of Georgia</u>

*Frances Humphrey, et al. v. Wyeth, Inc., et al.*, C.A. No. 1:04-1566

### <u>Southern District of Mississippi</u>

*Sheryl Lynne Renfroe v. Wyeth, Inc.*, C.A. No. 3:04-717

- 2 -

**MDL-1203 Attachment A (Continued)**

<u>Southern District of New York</u>

*Milagros Luis v. American Home Products Corp., et al.*, C.A. No. 1:03-8290
*Rosolyn J. Liebman-Rube, et al. v. American Home Products Corp., et al.*, C.A. No. 1:03-8291
*Eva Sirna, et al. v. American Home Products Corp., et al.*, C.A. No. 1:04-5487

<u>Southern District of Texas</u>

*Joe A. Munoz v. Wyeth*, C.A. No. 4:03-4558
*Kymberly A. Broyles v. Wyeth, et al.*, C.A. No. 4:03-4734
*Rebecca S. Johnson v. Wyeth*, C.A. No. 4:03-4809
*Sandra Autrey-Karnes v. Wyeth, et al.*, C.A. No. 4:03-4814
*Sophronia G. Bourgeois v. Wyeth*, C.A. No. 4:03-4817
*Kimberly J. Bounds v. Wyeth*, C.A. No. 4:03-4818
*Sherry Bess v. Wyeth*, C.A. No. 4:03-4819
*Shauna L. Stelse v. Wyeth*, C.A. No. 4:03-4820
*Ethel L. Gardley v. Wyeth, et al.*, C.A. No. 4:03-4821
*Germania D. Sitomer v. Wyeth*, C.A. No. 4:03-4824
*John D. Bruderor v. Wyeth*, C.A. No. 4:03-4825
*Evelyn J. Vela v. Wyeth*, C.A. No. 4:03-4826
*Steve W. Siebeneicher v. Wyeth, et al.*, C.A. No. 4:03-4828
*Myra C. Leslie v. Wyeth, et al.*, C.A. No. 4:03-4830
*Janice L. Hall v. Wyeth*, C.A. No. 4:03-4832
*Wanda G. Robinson v. Wyeth*, C.A. No. 4:03-4835
*Ginger S. Glass v. Wyeth, et al.*, C.A. No. 4:03-4836
*Ruby M. Howard v. Wyeth*, C.A. No. 4:03-4839
*Nikkole R. Kettle v. Wyeth*, C.A. No. 4:03-4846
*Jami L. Hain v. Wyeth, et al.*, C.A. No. 4:03-4848
*Christina R. Buck v. Wyeth, et al.*, C.A. No. 4:03-4849
*Martha V. Ruiz v. Wyeth*, C.A. No. 4:03-4851
*Barbara L. Hirsch v. Wyeth*, C.A. No. 4:03-4852
*Brenda K. Stewart v. Wyeth*, C.A. No. 4:03-4853
*Mary L. Thomas v. Wyeth*, C.A. No. 4:03-4854
*Olga Castro v. Wyeth, et al.*, C.A. No. 4:03-4904
*Glenda J. Schochler v. Wyeth, et al.*, C.A. No. 4:03-4905
*Susan L. Rivas v. Wyeth*, C.A. No. 4:03-4907
*Melanie A. Gray v. Wyeth*, C.A. No. 4:03-4908

- 3 -

**MDL-1203 Attachment A (Continued)**

<u>Southern District of Texas</u> (Continued)

*Belinda P. McAdams v. Wyeth*, C.A. No. 4:03-4909
*Eleanor L. Baker v. Wyeth*, C.A. No. 4:03-4911
*Tory R. Khaleq v. Wyeth, et al.*, C.A. No. 4:03-4914
*Peggy S. Hudson v. Wyeth, et al.*, C.A. No. 4:03-4915
*Patricia L. Green v. Wyeth, et al.*, C.A. No. 4:03-4917
*Belle L. Gwaltney v. Wyeth*, C.A. No. 4:03-4918
*Jodie M. Nanni v. Wyeth*, C.A. No. 4:03-4919
*Wanda K. Ratliff v. Wyeth*, C.A. No. 4:03-4920
*Connie D. Bale v. Wyeth, et al.*, C.A. No. 4:03-4921
*Joyce E. Lewis v. Wyeth*, C.A. No. 4:03-4922
*Rea Jane Halter v. Wyeth, et al.*, C.A. No. 4:03-4924
*Deborah K. Roberts v. Wyeth, et al.*, C.A. No. 4:03-4926
*Frank Vollaro v. Wyeth, et al.*, C.A. No. 4:03-4928
*Donna C. Rodgers v. Wyeth*, C.A. No. 4:03-4931
*Phyllis A. Thompson v. Wyeth*, C.A. No. 4:03-4940
*Shelly Hourani, et al. v. Wyeth*, C.A. No. 4:04-277

PROCEDURES FOR ORAL ARGUMENT BEFORE THE
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

All oral argument is governed by the provisions of Rule 16.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (effective April 2, 2001). Rule 16.1(g) allows a maximum of twenty minutes for oral argument in each matter. In most cases, however, less time is necessary for the expression of all views and the Panel reserves the prerogative of reducing the time requested by counsel. Accordingly, counsel should be careful not to overstate the time requested for oral argument.

The Panel insists that counsel limit all oral argument to the appropriate criteria. See generally In re "East of the Rockies" Concrete Pipe Antitrust Cases, 302 F. Supp. 244, 255-56 (J.P.M.L. 1969) (concurring opinion) (discussion concerning criteria for transfer).

Rule 16.1 is duplicated in its entirety hereafter for your convenience.

RULE 16.1:   HEARING SESSIONS AND ORAL ARGUMENT

(a)     Hearing sessions of the Panel for the presentation of oral argument and consideration of matters taken under submission without oral argument shall be held as ordered by the Panel.  The Panel shall convene whenever and wherever desirable or necessary in the judgment of the Chairman.  The Chairman shall determine which matters shall be considered at each hearing session and the Clerk of the Panel shall give notice to counsel for all parties involved in the litigation to be so considered of the time, place and subject matter of such hearing session.

(b)     Each party filing a motion or a response to a motion or order of the Panel under Rules 7.2, 7.3, 7.4 or 7.6 of these Rules may file simultaneously therewith a separate statement limited to one page setting forth reasons why oral argument should, or need not, be heard.  Such statements shall be captioned "Reasons Why Oral Argument Should [Need Not] Be Heard," and shall be filed and served in conformity with Rules 5.12 and 5.2 of these Rules.

(c)     No transfer or remand determination regarding any action pending in the district court shall be made by the Panel when any party timely opposes such transfer or remand unless a hearing session has been held for the presentation of oral argument except that the Panel may dispense with oral argument if it determines that:
      (i)     the dispositive issue(s) have been authoritatively decided; or
      (ii)    the facts and legal arguments are adequately presented in the briefs and record,
    and the decisional process would not be significantly aided by oral argument.
Unless otherwise ordered by the Panel, all other matters before the Panel, such as a motion for reconsideration, shall be considered and determined upon the basis of the papers filed.

(d)     In those matters in which oral argument is not scheduled by the Panel, counsel shall be promptly advised.  If oral argument is scheduled in a matter the Clerk of the Panel may require counsel for all parties who wish to make or to waive oral argument to file and serve notice to that effect within a stated time in conformity with Rules 5.12 and 5.2 of these Rules.  Failure to do so shall be deemed a waiver of oral argument by that party. If oral argument is scheduled but not attended by a party, the matter shall not be rescheduled and that party's position shall be treated as submitted for decision by the Panel on the basis of the papers filed.

(e)     Except for leave of the Panel on a showing of good cause, only those parties to actions scheduled for oral argument who have filed a motion or written response to a motion or order shall be permitted to appear before the Panel and present oral argument.

(f)     Counsel for those supporting transfer or remand under Section 1407 and counsel for those opposing such transfer or remand are to confer separately prior to the oral argument for the purpose of organizing their arguments and selecting representatives to present all views without duplication.

(g)     Unless otherwise ordered by the Panel, a maximum of twenty minutes shall be allotted for oral argument in each matter.  The time shall be divided equally among those with varying viewpoints. Counsel for the moving party or parties shall generally be heard first.

- 2 -

(h)      So far as practicable and consistent with the purposes of Section 1407, the offering of oral testimony before the Panel shall be avoided.  Accordingly, oral testimony shall not be received except upon notice, motion and order of the Panel expressly providing for it.

(i)      After an action or group of actions has been set for a hearing session, consideration of such action(s) may be continued only by order of the Panel on good cause shown.

# <u>EXHIBIT 2</u>



Home | Previous Page

**U.S. Securities and Exchange Commission**

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**Investment Advisers Act of 1940**
**Release No. 2213 / February 5, 2004**

**Investment Company Act of 1940**
**Release No 26347 / February 5, 2004**

**Administrative Proceeding**
**File No. 3-11393**

| | |
|---|---|
| In the Matter of<br>**MASSACHUSETTS FINANCIAL**<br>**SERVICES CO., JOHN W. BALLEN**<br>**AND KEVIN R. PARKE,**<br><br>**Respondents** | **ORDER INSTITUTING**<br>**ADMINISTRATIVE AND CEASE-AND-**<br>**DESIST PROCEEDINGS PURSUANT TO**<br>**SECTIONS 203(e), 203(f) AND 203(k)**<br>**OF THE INVESTMENT ADVISERS ACT**<br>**OF 1940 AND SECTIONS 9(b) AND 9**<br>**(f) OF THE INVESTMENT COMPANY**<br>**ACT OF 1940, MAKING FINDINGS,**<br>**AND IMPOSING REMEDIAL**<br>**SANCTIONS AND A CEASE-AND-**<br>**DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Massachusetts Financial Services Co. ("MFS"), John W. Ballen ("Ballen") and Kevin R. Parke ("Parke") (collectively "Respondents").

**II.**

In anticipation of the institution of these proceedings, MFS, Ballen and Parke each have submitted an Offer of Settlement (collectively, the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203 (e), 203(f) and 203(k) of the Investment Advisers Act of 1940 and Sections

9(b) and 9(f) of the Investment Company Act of 1940, Making Findings,
and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"),
as set forth below.

### III.

On the basis of this Order and Respondents' Offers, the Commission finds[1]
that:

### Summary

1. MFS, Ballen, and Parke willfully violated antifraud provisions of the
Investment Advisers Act and the Investment Company Act by allowing
widespread market timing trading in certain MFS funds from at least late
1999 through October 2003 in contravention of the funds' prospectus
disclosures.

2. MFS is the investment adviser and sponsor of approximately 140 mutual
funds, including a group of 104 funds known as the MFS Retail Funds.
Beginning as early as September 1999, the prospectuses of the MFS Retail
Funds stated that "the MFS funds do not permit market timing or other
excessive trading practices. Excessive short-term (market timing) trading
practices may disrupt portfolio management strategies and harm fund
performance." In early 2002, MFS began to modify this language to state
that "the MFS funds do not permit market timing or other excessive trading
practices that may disrupt portfolio management strategies and harm fund
performance." These statements were misleading because Respondents
permitted widespread market timing trading in a group of approximately
ten large cap equity, fixed income or money market mutual funds internally
designated as the "Unrestricted Funds."

3. Respondents did not disclose in the prospectuses of the MFS Retail
Funds, nor did they effectively communicate to the boards of the MFS Retail
Funds, MFS's internal policy of allowing market timing trading in its
Unrestricted Funds. Respondents also failed to disclose the conflict of
interest created by MFS's acceptance of investments from market timers
and management fees paid on a percentage of those investments, contrary
to the interests of long-term shareholders. Ballen approved and Ballen and
Parke implemented MFS's trading policy permitting market timing in its
Unrestricted Funds during the same period that they signed registration
statements for certain Unrestricted Funds that prohibited market timing.

4. Because all of the Unrestricted Funds were either large cap domestic
equity funds or large funds with highly liquid domestic assets, Respondents
believed that the Unrestricted Funds were not susceptible to successful
exploitation of inefficiencies in mutual fund pricing. Respondents, however,
failed to determine whether market timing was causing harm to the
Unrestricted Funds. MFS's internal market timing policy led to widespread
and substantial short term transactions, including what appears to have
been a significant amount of illegal late trading in the Unrestricted Funds.
During this period, MFS failed to detect the late trading by a number of the
market timers and the full extent of the harm caused to the Unrestricted
Funds by market timing generally. The late traders reaped substantial
profits at the expense of other fund shareholders.

5. By virtue of the activities alleged herein, MFS, Ballen, and Parke willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") and Section 34(b) of the Investment Company Act of 1940 ("Investment Company Act").

## Respondents

6. MFS is a Delaware corporation headquartered in Boston, Massachusetts and has
been registered with the Commission as an investment adviser since 1982. MFS is a more than 90 percent owned subsidiary of Sun Life Financial Inc., a Canadian company whose common stock trades on the New York Stock Exchange. MFS is the investment adviser and sponsor of approximately 140 mutual funds in the MFS Family of Funds ("MFS Funds"). The MFS Retail Funds, of which there are 104, are a subset of the MFS Funds. As of August 31, 2003, assets of the MFS Retail Funds were approximately $73 billion. Throughout the relevant time period, MFS mutual funds were continually offered and sold to the public. MFS Retail Funds are sold through unaffiliated broker-dealers or directly to institutional clients. MFS does not sell its funds directly to retail investors.

7. Ballen, age 44, was president of MFS from August 1998 through 2001, and has
been MFS's chief executive officer from 2002 to the present. He also has been a member of the board of trustees for the MFS Retail Funds since 2001.

8. Parke, age 44, was chief equity officer of MFS from August 1998 through early
2001. He was appointed MFS's president in 2002 and chief investment officer in 2001 and has held those positions to the present. He has also been a member of the board of trustees for the MFS Retail Funds since early 2002.

## Facts

### Introduction

9. MFS is the investment adviser to the MFS Retail Funds. MFS had an internal policy not disclosed in its prospectuses that permitted market timing in a group of MFS Retail Funds internally designated as "Unrestricted Funds" from at least late 1999 through October 2003. As of July 2003, the Unrestricted Funds consisted of eleven equity, fixed income or money market funds with approximately $40 billion in assets, as follows:

MFS Emerging Growth Fund
MFS Research Fund
MFS Value Fund
Massachusetts Investors Trust
Massachusetts Investors Growth Stock Fund
MFS Total Return Fund
MFS Government Securities Fund
MFS Government Mortgage Fund
MFS Bond Fund

MFS Money Market Fund
MFS Cash Reserves Fund

10. Market timing includes (a) frequent buying and selling of shares of the same mutual fund
or (b) buying or selling mutual fund shares in order to exploit inefficiencies in mutual fund pricing. Market timing, while not illegal per se, can harm other mutual fund shareholders because it can dilute the value of their shares, if the market timer is exploiting pricing inefficiencies, or disrupt the management of the mutual fund's investment portfolio and can cause the targeted mutual fund to incur costs borne by other shareholders to accommodate frequent buying and selling of shares by the market timer.

11. Because all of the Unrestricted Funds were either large cap domestic equity funds or large funds with highly liquid domestic assets, Respondents believed that the Unrestricted Funds were not susceptible to successful exploitation of inefficiencies in mutual fund pricing. Respondents, however, failed to determine whether market timing was causing harm to the Unrestricted Funds. Following MFS's decision to allow market timing in the Unrestricted Funds, market timing assets in the Unrestricted Funds substantially increased over time, and caused increasing damage and disruption to those funds.

The Prospectus Disclosures

12. Beginning as early as September 1999, the MFS Retail Funds, including the Unrestricted Funds, adopted the following disclosure concerning market timing in their prospectuses:

> The MFS Funds do not permit market-timing or other excessive trading practices. Excessive short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. To minimize harm to the MFS funds and their shareholders, the MFS funds will exercise these rights if an investor has a history of excessive trading or if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

This language appeared in the prospectuses of certain of the Unrestricted Funds as late as March 31, 2003.

13. In April 2002, MFS began to modify the foregoing prospectus disclosure in its MFS Retail Funds, including the Unrestricted Funds, with the following statement:

> The MFS Funds do not permit market timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS Funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or cancelling [sic] purchase and exchange

orders, delaying for up to two business days the processing of
exchange requests, and restricting the availability of purchases and
exchanges through telephone requests, facsimile transmissions,
automated telephone services, internet services or any electronic
transfer service, if an investors trading, in the judgment of MFS
Funds, has been or may be disruptive to a fund. In making this
judgment, the MFS Funds may consider trading done in multiple
accounts under common ownership or control.

The modified language appeared in the prospectuses for all MFS Retail
Funds, variously, until at least November 2003.

14. Respondents Ballen and Parke signed all but one of the registration
statements for the
Unrestricted Funds during 2002 and 2003. In addition, Ballen signed two
registration statements for those funds in 2001.

### MFS's Internal Policy Allowed Market Timing

15. The MFS prospectus disclosures described above were misleading
because Respondents permitted widespread market timing trading in its
Unrestricted Funds from at least late 1999 through October 2003. Because
of this internal policy, MFS did not prohibit or limit market timing activity in
those funds during the period of its misleading prospectus disclosures.

16. As a result of MFS's internal policies, market timing was widespread
within the Unrestricted Funds. According to internal estimates reported to
Ballen and Parke in September 2003, known market timers at MFS held
approximately $2 billion in assets as of May 31, 2003. This amount
constituted approximately 5 percent of all assets in MFS's Unrestricted
Funds, which had assets of approximately $40 billion as of April 30, 2003.

17. MFS not only permitted market timing in its Unrestricted Funds, but it
also directedknown market timers into its Unrestricted Funds. Beginning at
least as early as July 2001, MFS routinely provided certain broker-dealers
with its internal policy allowing market timing in the Unrestricted Funds,
and routinely directed known market timers to the Unrestricted Funds.

### Ballen and Parke Approved and Implemented the Internal Policy

18. Ballen approved the MFS policy permitting market timing in the
Unrestricted Funds. In addition, in consultation with portfolio managers, he
made the initial determination of which funds to designate as Unrestricted
Funds. He also was involved in the process by which certain large-dollar
market timing transactions in the Unrestricted Funds were approved. Thus,
Ballen played a significant role in creating and applying MFS's internal
policy permitting market timing in the Unrestricted Funds.

19. Throughout the relevant period, Ballen reviewed certain of the MFS
Retail Fund prospectuses, including the disclosures regarding market
timing, before their dissemination. In addition, Ballen signed two
registration statements for the Unrestricted Funds in 2001, all but one of
the Unrestricted Funds' registration statements in 2002, and all of the
registration statements for those funds in 2003. Thus, Ballen knew or

Case 1:05-cv-10804-MEL    Document 10-3    Filed 06/20/2005    Page 7 of 21

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February 5, ... Page 6 of 20

recklessly disregarded that disclosures made in MFS Retail Fund prospectuses about market timing from September 1999 through October 2003 were misleading.

20. Parke also played a significant role in shaping and applying MFS's policy permitting market timing in the Unrestricted Funds. Parke had primary responsibility for determining which funds, previously designated as Unrestricted Funds by Ballen, should continue to be designated as Unrestricted Funds. Parke also reviewed MFS's internal market timing policies in mid-January 2003 and affirmatively decided not to make changes to the policies at that time. Parke also approved certain high-dollar market timing transactions.

21. Throughout the relevant period, Parke was aware of the MFS Retail Fund prospectus disclosures regarding market timing. In addition, Parke signed all but one of the registration statements for the Unrestricted Funds in 2002 and all of the registration statements for those funds in 2003. Thus, Parke knew or recklessly disregarded that disclosure statements made in MFS Retail Fund prospectuses about market timing from September 1999 through October 2003 were misleading.

22. In addition, on at least three occasions between June 2000 and June 2003, MFS employees proposed that MFS consider changing the internal market timing policy of the Unrestricted Funds by banning market timing in those funds. On each such occasion, the policy remained unchanged.

Harm to the Funds

23. At all relevant times, late trading and other market timing activities in the Unrestricted Funds caused appreciable harm and disruption.

24. During the relevant period, Ballen and Parke became aware of indications that market timing caused potential and actual harm and disruption to the Unrestricted Funds. For example:

(a) In a July 3, 2003 email, Ballen stated that market timing is "very disruptive in lots of places to the organization and in some cases can harm the performance of the funds due to higher trading costs as the funds buy and sell due to the cash changes." In the same email, Ballen acknowledged that market timing activity was increasing.

(b) In October 2002, the MFS chief administrative officer informed Parke that market timing in the MFS Research Fund ("Research Fund") was negatively affecting the fund's net cash flows, and inquired whether the fund should be removed from the Unrestricted List. However, Respondents, including Parke, allowed market timing to continue in the Research Fund through at least October 2003.

(c) An MFS fund known as the Massachusetts Investor Trust Fund ("MIT") suffered disruption from market timing starting at least in the spring of 2003 and continuing at least to August 2003. In or about April 2003, the portfolio manager of MIT informed Parke that MIT on one occasion had been forced to draw on its line of credit as a result of market timing activity in the fund. On April 17, 2003, the same

individual notified Parke by email of continuing activity from market timers that was resulting in large swings in cash flow in MIT. In about May and June 2003, MIT continued to experience cash flow problems as a result of market timers, including additional days on which the fund experienced disruptions resulting from redemption requests by market timers leaving the fund. Market timing activity continued in the MIT fund through at least August 2003.

(d) In about January 2003, Parke learned of market timing disruption to an MFS fund known as the MFS Government Mortgage Fund ("GMF"). The GMF Fund nonetheless remained on the Unrestricted Funds list. In July 2003, the GMF portfolio manager informed Parke of problems caused by market timing in that fund. In an internal e-mail to a top-level executive at an MFS subsidiary, Parke wrote, "[t]imers in the Government Mortgage Fund have become an increasingly large problem. The size and frequency has increased. This is adding complexity to the portfolio management process. Can we take this fund off the timer list?" Ultimately, however, the Respondents, including Parke, allowed market timing to continue in GMF and the other Unrestricted Funds through October 2003.

25. During the relevant period, there were additional indications that market timing caused
potential and actual harm and disruption to the Unrestricted Funds. For example:

(a) As early as June 2000, a senior MFS employee included in a presentation a chart entitled "Market Timing Wheel of Terror." The presentation warned that "[l]ong term investors are being penalized" by market timers and recommending specific actions to eliminate timing in all of MFS's funds, including a recommendation to notify brokers that MFS would not accept any market timing assets.

(b) In early 2002, MFS's market timing monitor and others began to remove the MFS Emerging Growth Fund ("MEG") from the Unrestricted Funds list due to disruption to the fund. The fund was not removed, however, at least in part because two senior executives from an MFS subsidiary requested in January 2002 that "certain timers be allowed to continue to add money to [MEG]." In approximately June 2002, an overdraft in MEG caused the fund's portfolio manager to state to another MEG portfolio manager "a big part of the problem with MEG cash is that all the `timers' have migrated to this fund. [A portfolio manager] and others have effectively tossed them from their funds, and Ballen was willing to have the timers focus on MEG." Despite the disruption, however, Respondents allowed market timing to continue in the MEG fund through at least October 2003.

26. Late traders, or those who place mutual fund trades after the close of the market
but illegally receive fund prices calculated for trades placed prior to the market's close, were among those engaging in excessive trades in the Unrestricted Funds. Certain late traders reaped substantial profits from their transactions in the Unrestricted Funds. Indeed, it appears that the majority of the harm caused to shareholders in the Unrestricted Funds was the result of illegal late trading by a number of market timers. Respondents

did not detect the late trading and further did not identify the full extent of the harm caused to the Unrestricted Funds by market timing transactions that were allowed in contravention of the funds' prospectus disclosures.

### Respondents Benefitted from Market Timing

27. Acceptance of market timing money was profitable to MFS as it generated millions of dollars in management fees. Such fees are based on a percentage of assets under management. Thus, MFS received advisory fees on market timing assets that it would not otherwise have received had MFS barred market timing trading pursuant to the policy stated in its prospectus disclosures. Respondents Ballen and Parke also benefitted from approving the receipt of market timing assets. Because the MFS bonus pool during the relevant period was determined as a percentage of MFS income, increased management fees generated by investment of market timing money increased the size of the bonus pool paid to MFS employees, including Ballen and Parke. Over the course of four years this increased the bonuses paid to Ballen by $57,736.56 and the bonuses paid to Parke by $58,853.02

28. Respondents failed to disclose the conflict of interest created by MFS's acceptance of investments from market timers and management fees paid on a percentage of those investments, contrary to the interests of long-term shareholders. Respondents did not disclose publicly to shareholders of the MFS Retail Funds, nor did they effectively communicate to the boards of the MFS Retail Funds, MFS's internal policy of allowing market timing trading in its Unrestricted Funds. Respondents Ballen and Parke approved and implemented MFS's trading policy permitting market timing in its Unrestricted Funds during the same period that they signed registration statements for certain Unrestricted Funds that prohibited market timing. At all times material hereto, MFS acted through Ballen and Parke, and the misconduct of Ballen and Park is attributed to MFS.

### Violations

29. As a result of the conduct described in Section III above, MFS, Ballen and Parke
willfully violated Sections 206(1) and 206(2) of the Advisers Act in that they, while acting as investment advisers, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, MFS, Ballen and Parke permitted widespread market timing trading in certain MFS mutual funds in contravention of those funds' prospectus disclosures, with knowledge or reckless disregard of the fact that the internal policy was harmful or potentially harmful to the funds' long-term shareholders.

30. As a result of the conduct described in Section III above, MFS, Ballen and Parke
willfully violated Section 34(b) of the Investment Company Act in that they made an untrue statement of material fact in a registration statement, application, report, account, record, or other document filed or transmitted pursuant to the Investment Company Act, or omitted to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially

misleading.

## Certain Remedial Efforts and Undertakings

31. In determining to accept the Offers, the Commission further considered the following efforts voluntarily undertaken by MFS:

a. MFS shall use its best efforts to cause the MFS Retail Funds to continue to operate in accordance with the following governance policies and practices:

i. No more than 25 percent of the members of the board of trustees of any MFS Retail Fund will be persons who either: (A) were directors, officers or employees of MFS at any point during the preceding 10 years; or (B) are interested persons, as defined in the Investment Company Act, of the fund or of MFS, provided that no current trustee shall be removed before January 1, 2005 for failure to meet the 10-year requirement. In the event that the board of trustees fails to meet this requirement at any time due to the death, resignation, retirement or removal of any independent trustee, the independent trustees will take such steps as may be necessary to bring the board in compliance within a reasonable period of time;

ii. No chairman of the board of trustees of any MFS Retail Fund will either: (A) have been a trustee, officer or employee of MFS at any point during the preceding 10 years; or (B) be an interested person, as defined in the Investment Company Act, of the fund or of MFS; and

iii. Any person who acts as counsel to the independent trustees of any MFS Retail Fund will be an "independent legal counsel" as defined by Rule 0-1 under the Investment Company Act and will not have any employment, consultant, attorney-client, auditing or other professional relationship with MFS.

b. No action will be taken by the board of trustees of any MFS Retail Fund or by any committee thereof unless such action is approved by a majority of the members of the board of trustees or of such committee, as the case may be, who are not either: (i) persons who were directors, officers or employees of MFS at any point during the preceding 10 years; or (ii) interested persons, as defined in the Investment Company Act, of the fund or of MFS. In the event that any action proposed to be taken by and approved by a vote of a majority of the independent trustees of a fund is not approved by the full board of trustees, the fund will disclose such proposal and the related board vote in its shareholder report for such period.

c. Commencing in 2005 and not less than every fifth calendar year thereafter, each MFS Retail Fund will hold a meeting of shareholders at which the board of trustees will be elected.

d. Each MFS Retail Fund will designate an independent compliance officer reporting to its board of trustees as being responsible for

Case 1:05-cv-10804-MEL    Document 10-3    Filed 06/20/2005    Page 11 of 21

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February ...   Page 10 of 20

assisting the board of trustees and any of its committees in monitoring compliance by MFS with the federal securities laws, MFS's fiduciary duties to fund shareholders and its Code of Ethics in all matters relevant to the operation of the MFS Retail Funds. The duties of this person will include reviewing all compliance reports furnished to the board of trustees or its committees by MFS, attending meetings of MFS's Internal Compliance Controls Committee to be established pursuant to MFS's undertakings set forth in paragraph IV.B.1.b below, serving as liaison between the board of trustees and its committees and the chief compliance officer of MFS, making such recommendations to the board of trustees regarding MFS's compliance procedures as may appear advisable from time to time, and promptly reporting to the board of trustees any material breach of fiduciary duty, breach of the Code of Ethics and/or violation of the federal securities laws of which he or she becomes aware in the course of carrying out his or her duties.

e. Ongoing Cooperation. MFS shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order. In connection with such cooperation, MFS has undertaken:

i. To produce, without service of a notice or subpoena, any and all documents and other information reasonably requested by the Commission's staff;

ii. To use its best efforts to cause its employees to be interviewed by the Commission's staff at such times as the staff reasonably may direct;

iii. To use its best efforts to cause its employees to appear and testify truthfully and completely without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission's staff; and

iv. That in connection with any testimony of MFS to be conducted at deposition, hearing or trial pursuant to a notice or subpoena, MFS:

A. Agrees that any such notice or subpoena for MFS's appearance and testimony may be served by regular mail on its attorney, Donald K. Stern, Esq., Bingham McCutchen, LLP, 150 Federal Street, Boston, Massachusetts 02210-1726; and

B. Agrees that any such notice or subpoena for MFS's appearance and testimony in an action pending in a United States District Court may be served, and may require testimony beyond the territorial limits imposed by the Federal Rules of Civil Procedure.

## IV.

In view of the foregoing, including the cooperation afforded the staff by Respondents and the special committee of MFS's board of directors during

the course of its investigation, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondents' Offers.

Accordingly, it is hereby ORDERED:

A. Pursuant to Sections 203(k) of the Advisers Act and 9(f) of the Investment Company Act, Respondents MFS, Ballen and Parke shall cease and desist from committing or causing any violations and any future violations of Sections 206(1) and 206(2) of the Advisers Act and Section 34 (b) of the Investment Company Act.

**Undertakings**

It is further ORDERED that:

B. General Compliance. MFS shall comply with the following undertakings:

1. MFS shall maintain a compliance and ethics oversight infrastructure having the following characteristics:

a. MFS shall maintain a Code of Ethics Oversight Committee having responsibility for all matters relating to issues arising under the MFS Code of Ethics. The Code of Ethics Oversight Committee shall be comprised of senior executives of MFS's operating businesses. MFS shall hold at least quarterly meetings of the Code of Ethics Oversight Committee to review violations of the Code of Ethics, as well as to consider policy matters relating to the Code of Ethics. MFS shall report on issues arising under the Code of Ethics to the extent relating to fund business, including all violations thereof, to the Compliance or Audit Committee of the trustees of the MFS Retail Funds with such frequency as the Compliance or Audit Committee may instruct, and in any event at least quarterly, provided however that any material violation shall be reported promptly to the Compliance or Audit Committee of MFS.

b. MFS shall establish an Internal Compliance Controls Committee to be chaired by MFS's chief compliance officer, which Committee shall have as its members senior executives of MFS's operating businesses. Notice of all meetings of the Internal Compliance Controls Committee shall be given to the independent compliance officer of the trustees of the MFS Retail Funds, who shall be invited to attend and participate in such meetings provided that the involvement of the independent compliance officer shall be limited to compliance issues relating to the MFS Retail Funds. The Internal Compliance Controls Committee shall review compliance issues throughout the business of MFS, endeavor to develop solutions to those issues as they may arise from time to time, and oversee implementation of those solutions. The Internal Compliance Controls Committee shall provide reports on internal compliance matters to the Compliance or Audit Committee of the trustees of the MFS Retail Funds with such frequency as the independent trustees of such funds may instruct, and in any event at least quarterly. MFS shall also provide to the Risk Review or Audit Committee of Sun Life Financial Inc. the same reports of the Code of Ethics Oversight Committee and the Internal Compliance Controls Committee that it provides to the Compliance or Audit Committee of the MFS Retail

Funds.

2. MFS shall at its own expense establish and staff a full-time senior-level position whose responsibilities shall include compliance matters related to conflicts of interests. This officer will report directly to the chief compliance officer of MFS.

3. MFS shall require that MFS's chief compliance officer or a member of his or her staff review compliance with the policies and procedures established to address compliance issues under the Investment Advisers Act and Investment Company Act and that any violations be reported to the Internal Compliance Controls Committee.

4. MFS shall require the chief compliance officer of MFS to report to the independent directors of the MFS Retail Funds any breach of fiduciary duty and/or the federal securities laws to the extent relating to fund business of which he or she becomes aware in the course of carrying out his or her duties, with such frequency as the independent directors may instruct, and in any event at least quarterly, provided however that any material breach (i.e., any breach that would be important, qualitatively or quantitatively, to a reasonable director) shall be reported promptly.

5. MFS shall establish a corporate ombudsman to whom MFS employees may convey concerns about MFS business matters that they believe implicate matters of ethics or questionable practices. MFS shall establish procedures to investigate matters brought to the attention of the ombudsman, and these procedures shall be presented for review and approval by the independent directors of the MFS Retail Funds. MFS shall also review matters to the extent relating to fund business brought to the attention of the ombudsman, along with any resolution of such matters, with the independent directors of the MFS Retail Funds with such frequency as the independent directors of such funds may instruct.

C. Distribution of Disgorgement and Penalty. MFS shall also comply with the following undertakings:

1. MFS shall retain, within 30 days of the date of entry of the Order, the services of an Independent Distribution Consultant acceptable to the staff of the Commission and the independent directors of the MFS Retail Funds. The Independent Distribution Consultant's compensation and expenses shall be borne exclusively by MFS. The Independent Distribution Consultant shall develop a Distribution Plan for the distribution of the total disgorgement and penalty ordered in paragraphs IV.S through IV.U below to the mutual funds and their shareholders to compensate fairly and proportionately the funds' shareholders for losses attributable to late trading and other market timing trading activity during the relevant period, according to a methodology developed in consultation with MFS and the independent trustees of the affected MFS Retail Funds and acceptable to the staff of the Commission. The Distribution Plan shall provide for fund investors to receive, in order of priority, (i) their aliquot share of losses suffered by the fund due to late trading and market timing trading activity, and (ii) a proportionate share of advisory fees paid by such fund during the period of such late trading and other market timing trading activity. MFS shall cooperate fully with the Independent Distribution Consultant and shall provide the Independent Distribution Consultant with access to its files,

books, records, and personnel as reasonably requested for the review.

2. To require the Independent Distribution Consultant to submit to MFS and the staff of the Commission the Distribution Plan no more than 120 days after the date of entry of the Order.

3. With respect to any determination or calculation of the Independent Distribution Consultant with which MFS or the staff of the Commission does not agree, such parties shall attempt in good faith to reach an agreement within 150 days of the date of entry of the Order. In the event that MFS and the staff of the Commission are unable to agree on an alternative determination or calculation, within 180 days of the date of entry of the Order, they shall each advise, in writing, the Independent Distribution Consultant of any determination or calculation from the Distribution Plan that it considers to be inappropriate and state in writing the reasons for considering such determination or calculation inappropriate.

4. Within 195 days of the date of entry of this Order, the Independent Distribution Consultant shall submit the Distribution Plan for the administration and distribution of disgorgement and penalty funds pursuant to Rule 610 [17 C.F.R. § 201.610] of the Commission's Rules of Practice. Following a Commission order approving a final plan of disgorgement, as provided in Rule 613 [17 C.F.R. § 201.613] of the Commission's Rules of Practice, the Independent Distribution Consultant and MFS shall take all necessary and appropriate steps to administer the final plan for distribution of disgorgement and penalty funds.

5. To require the Independent Distribution Consultant to enter into an agreement that provides that, for the period of the engagement and for a period of two years from completion of the engagement, the Independent Distribution Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Distribution Consultant will require that any firm with which the Independent Distribution Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

D. Excess Recovery. MFS shall also undertake to disgorge and pay to the Commission all funds in excess of $175 million that it obtains, through settlement, final judgment or otherwise, from individuals or entities alleged to have engaged in late trading and/or market timing in any of MFS Retail Funds. Such funds shall be distributed pursuant to the Distribution Plan referenced in paragraph IV.C.1 above.

E. Independent Compliance Consultant. MFS shall also comply with the following undertakings:

1. MFS shall retain, within 30 days of the date of entry of the Order, the services of an Independent Compliance Consultant acceptable to the staff of

the Commission and the independent trustees of the MFS Retail Funds. The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by MFS or its affiliates. The Independent Compliance Consultant shall conduct a comprehensive review of MFS's supervisory, compliance, and other policies and procedures designed to prevent and detect conflicts of interest, breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by MFS and its employees. This review shall include, but shall not be limited to, a review of MFS's market timing and late trading controls across all areas of its business, a review of the MFS Retail Funds' pricing practices that may make those funds vulnerable to market timing, a review of the MFS Retail Funds' utilization of short term trading fees and other controls for deterring excessive short term trading, a review of possible governance changes in the MFS Retail Funds' boards to include committees organized by market sector or other criteria so as to improve compliance, and a review of MFS's policies and procedures concerning conflicts of interest. MFS shall cooperate fully with the Independent Compliance Consultant and shall provide the Independent Compliance Consultant with access to its files, books, records, and personnel as reasonably requested for the review.

2. At the conclusion of the review, which in no event shall be more than 120 days after the date of entry of the Order, MFS shall require the Independent Compliance Consultant to submit a Report to MFS, the trustees of the MFS Retail Funds and the staff of the Commission. The Report shall address the issues described in paragraph IV.E.1 of these undertakings, and shall include a description of the review performed, the conclusions reached, the Independent Compliance Consultant's recommendations for changes in or improvements to policies and procedures of MFS and the MFS Retail Funds, and a procedure for implementing the recommended changes in or improvements to MFS's policies and procedures.

3. MFS shall adopt all recommendations with respect to MFS contained in the Report of the Independent Compliance Consultant; provided, however, that within 150 days after the date of entry of the Order, MFS shall in writing advise the Independent Compliance Consultant, the trustees of the MFS Retail Funds and the staff of the Commission of any recommendations that it considers to be unnecessary or inappropriate. With respect to any recommendation that MFS considers unnecessary or inappropriate, MFS need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedure or system designed to achieve the same objective or purpose.

4. As to any recommendation with respect to MFS's policies and procedures on which MFS and the Independent Compliance Consultant do not agree, such parties shall attempt in good faith to reach an agreement within 180 days of the date of entry of the Order. In the event MFS and the Independent Compliance Consultant are unable to agree on an alternative proposal acceptable to the staff of the Commission, MFS will abide by the determinations of the Independent Compliance Consultant.

5. MFS: (i) shall not have the authority to terminate the Independent Compliance Consultant, without the prior written approval of the independent trustees of the MFS Retail Funds and the staff of the Commission; (ii) shall compensate the Independent Compliance Consultant,

and persons engaged to assist the Independent Compliance Consultant, for services rendered pursuant to the Order at their reasonable and customary rates; and (iii) shall not be in and shall not have an attorney-client relationship with the Independent Compliance Consultantand shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the Independent Compliance Consultant from transmitting any information, reports, or documents to the directors or the Commission.

6. To require the Independent Compliance Consultant to enter into an agreement that provides that, for the period of the engagement and for a period of two years from completion of the engagement, the Independent Compliance Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Compliance Consultant will require that any firm with which the Independent Compliance Consultant is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the independent directors of MFS's Board of Directors and the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with MFS, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

F. Periodic Compliance Review. Commencing in 2006, and at least once every other year thereafter, MFS shall undergo a compliance review by a third party, who is not an interested person, as defined in the Investment Company Act, of MFS. At the conclusion of the review, the third party shall issue a report of its findings and recommendations concerning MFS's supervisory, compliance, and other policies and procedures designed to prevent and detect breaches of fiduciary duty, breaches of the Code of Ethics and federal securities law violations by MFS and its employees in connection with their duties and activities on behalf of and related to the MFS Retail Funds. Each such report shall be promptly delivered to MFS's Internal Compliance Controls Committee and to the Compliance or Audit Committee of the board of trustees of each MFS Retail Fund.

G. Certification. No later than twenty-four months after the date of entry of the Order, the chief executive officer of MFS shall certify to the Commission in writing that MFS has fully adopted and complied in all material respects with the undertakings set forth in this section IV and with the recommendations of the Independent Compliance Consultant or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance.

H. Recordkeeping. MFS shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of MFS's compliance with the undertakings set forth in this section IV.

I. Deadlines. For good cause shown, the Commission's staff may extend any of the procedural dates set forth above.

J. Other Obligations and Requirements. Nothing in this Order shall relieve

MFS or any MFS Retail Fund of any other applicable legal obligation or requirement, including any rule adopted by the Commission subsequent to this Order.

**Suspensions and Prohibitions**

It is further ORDERED that:

K. Pursuant to Section 203(f) of the Advisers Act, that Respondent Ballen be, and hereby is, suspended from association with any investment adviser for a period of nine (9) months from the second Monday after the date of this Order.

L. Pursuant to Section 9(b) of the Investment Company Act, Respondent Ballen be prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor or principal underwriter for a period of nine (9) months from the second Monday after the date of this Order.

M. For a period of 27 months after the suspension described in paragraph IV.K has been completed, Ballen:

1. Shall not serve as an employee, officer or trustee of the MFS Funds or any other registered investment company;

2. Shall not serve as chairman or a member of the board of directors of MFS or any other investment adviser;

3. Shall not serve as chief executive officer, president or any other officer of MFS or any other investment adviser;

4. Shall not perform any duties for MFS or any other investment adviser relating to prospectus or other public disclosures, distribution, institutional or retail sales of MFS Funds or the funds of any other registered investment company, compliance matters, internal audit functions, or shareholder trading activities; and

5. May, to the extent such duties are not prohibited in paragraph IV.M.4 immediately above, (i) perform duties involving strategic planning, business analysis and business planning; (ii) be employed by and act as a portfolio manager of a registered investment company and/or manage other investment personnel with respect to investment and personnel decisions and (iii) participate in the marketing of non-mutual fund business of MFS or of such other investment adviser as may then employ Ballen.

N. Pursuant to Section 203(f) of the Advisers Act, that Respondent Parke be, and hereby is, suspended from association with any investment adviser for a period of six (6) months from thesecond Monday after the date of this Order.

O. Pursuant to Section 9(b) of the Investment Company Act, Respondent Parke be prohibited from serving or acting as an employee, officer, director,

member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor or principal underwriter for a period of six (6) months from the second Monday after the date of this Order.

P. For a period of 30 months after the suspension described in paragraph IV.N has been completed, Parke:

1. Shall not serve as an employee, officer or trustee of the MFS Funds or any other registered investment company;

2. Shall not serve as chairman or a member of the board of directors of MFS or any other investment adviser;

3. Shall not serve as chief executive officer, president or any other officer of MFS or any other investment adviser.

4. Shall not perform any duties for MFS or any other investment adviser relating to prospectus or other public disclosures, distribution, institutional or retail sales of MFS Funds or the funds of any other registered investment company, compliance matters, internal audit functions, or shareholder trading activities, and

5. May, to the extent such duties are not prohibited in paragraph IV.P.4 immediately above, (i) perform duties involving strategic planning, business analysis and business planning; (ii) be employed by and act as a portfolio manager of a registered investment company and/or manage other investment personnel with respect to investment and personnel decisions and (iii) participate in the marketing of non-mutual fund business of MFS or of such other investment adviser as may then employ Parke.

Q. Ballen and Parke shall provide to the Commission, within 30 days from the end of their respective suspension and prohibition periods described in paragraphs IV.K, IV.L, IV.N and IV.O above, an affidavit that each has complied fully with the sanctions described therein.

R. Ballen and Parke shall provide to the Commission, within three years from the date of this Order, an affidavit that each has complied fully with the restrictions described therein.

**Disgorgement and Civil Money Penalties**

It is further ORDERED that:

S. MFS shall, within 30 days of the entry of this Order, pay $175 million in disgorgement plus a civil money penalty of $50 million for a total payment of $225 million. Such payment shall be: (1) made by United States postal money order or wire transfer, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies MFS as a Respondent in these

proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 ("Fair Fund distribution"). Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, MFS agrees that it shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by MFS ("MFS Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, MFS agrees that it shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the MFS Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against MFS in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against MFS by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

T. Ballen shall, within 30 days of the entry of this Order, pay $57,736.56 in disgorgement, prejudgment interest of $6,322.32, plus a civil money penalty of $250,000 for a total payment of $314,058.88. Such payment shall be: (1) made by United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies Ballen as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to the Fair Fund distribution. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Ballen agrees that he shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Ballen ("Ballen Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Ballen agrees that he shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Ballen Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Ballen in this proceeding. For purposes of

Case 1:05-cv-10804-MEL    Document 10-3    Filed 06/20/2005    Page 20 of 21

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February ...    Page 19 of 20

this paragraph, a "Related Investor Action" means a private damages action brought against Ballen by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

U. Parke shall, within 30 days of the entry of this Order, pay $58,853.02 in disgorgement, prejudgment interest of $6,230.97, plus a civil money penalty of $250,000 for a total payment of $315,083.99. Such payment shall be: (1) made by United States postal money order, certified check, bank cashier's check or bank money order; (2) made payable to the Securities and Exchange Commission; (3) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Alexandria, Stop 0-3, VA 22312; and (4) submitted under cover letter that identifies Parke as a Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to David P. Bergers, Associate District Administrator, Boston District Office, Securities and Exchange Commission, 73 Tremont Street, Suite 600, Boston, Massachusetts, 02108-3912. Such civil money penalty may be distributed pursuant to the Fair Fund distribution. Regardless of whether any such Fair Fund distribution is made, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Parke agrees that he shall not, in any Related Investor Action, benefit from any offset or reduction of any investor's claim by the amount of any Fair Fund distribution to such investor in this proceeding that is proportionately attributable to the civil penalty paid by Parke ("Parke Penalty Offset"). If the court in any Related Investor Action grants such an offset or reduction, Parke agrees that he shall, within 30 days after entry of a final order granting the offset or reduction, notify the Commission's counsel in this action and pay the amount of the Parke Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed against Parke in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Parke by or on behalf of one or more investors based on substantially the same facts as alleged in the Order in this proceeding.

**Censure**

It is further ORDERED that:

V. Pursuant to Section 203(e) of the Advisers Act, that MFS be censured.

By the Commission.


                                        Jonathan G. Katz
                                        Secretary

Case 1:05-cv-10804-MEL    Document 10-3    Filed 06/20/2005    Page 21 of 21

Massachusetts Financial Services Co. et al.: Admin. Proc. Rel. No. IA-2213 / February ...    Page 20 of 20

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other persons or entities in this or any other proceeding.

*http://www.sec.gov/litigation/admin/ia-2213.htm*

Home | Previous Page                                                    Modified: 02/05/2004